**No. 21-50242**

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**
_____

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

ALBERT PINEDO,
*Defendant-Appellant*.
_____

On Appeal from the United States District Court
for the Central District of California, No. 2:20-cr-00148-GW
Honorable George H. Wu
_____

**APPELLANT'S OPENING BRIEF**
_____

CUAUHTEMOC ORTEGA
FEDERAL PUBLIC DEFENDER
  CENTRAL DISTRICT OF CALIFORNIA
MICHAEL GOMEZ
321 East 2nd Street
Los Angeles, California 90012
(213) 894-2854
Michael_Gomez@fd.org

*Counsel for Defendant-Appellant Albert Pinedo*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND ISSUES PRESENTED ....................................................1

STATEMENT OF JURISDICTION..........................................................................4

STATEMENT OF BAIL STATUS ...........................................................................4

FACTUAL AND PROCEDURAL HISTORY .........................................................4

    I.    Trial Evidence ...............................................................................4

        A.    Individuals with an atypical sexual interest in minors engage in coping strategies to avoid acting on their sexual desires...........................................................4

        B.    Pinedo posted an advertisement on Craigslist seeking sexual activity with "young men," which caught the attention of an undercover agent who was learning how to conduct undercover online investigations. .................................6

        C.    Pinedo corresponds with "Robby" and asks for photographs, but Radlinski never sent any. ...............................8

        D.    Pinedo and "Robby" arrange to meet to engage in sexual activity...........................................................9

        E.    Pinedo speaks on the phone with Radlinski, who does not use a voice modification device to alter his deeper voice. .......10

        F.    Pinedo shows up to the meeting location and is arrested. ........10

    II.    Jury Verdict and Sentencing ...............................................................11

SUMMARY OF THE ARGUMENT .......................................................................12

ARGUMENT .........................................................................................................14

    I.    The District Court Abused Its Discretion, Where It Declined to Excuse for Cause Two Prospective Jurors Who Displayed Significant Bias Against the Subject Matter of the Charges and

Pinedo's Anticipated Defense, and Never Unequivocally Stated That They Could Be Fair and Impartial. ...........................................14

    A.    Standard of Review...................................................................14

    B.    Factual Background .................................................................14

    C.    The district court was obligated to excuse the two biased jurors, given their actual biases and lack of unequivocal statements of impartiality..........................................................23

II.    The District Court Abused Its Discretion in Allowing a Detective From Another Jurisdiction to Testify as an Expert, Where His Testimony Served to Bolster the Credibility of the Undercover Agent in This Case. .............................................................................33

    A.    Standard of Review...................................................................33

    B.    Factual Background .................................................................33

    C.    The court should have precluded Nichols from testifying........37

III.    The District Court Abused Its Discretion in Admitting the Physical Sex Toy and Bottle of Lubricant, Where the Items' Minimal Probative Value Was Substantially Outweighed by Their Prejudicial Effect and Cumulative Nature. .........................................42

    A.    Standard of Review...................................................................42

    B.    Factual Background .................................................................42

    C.    The physical sex toy and lubricant should have been excluded under Federal Rule of Evidence 403. .......................43

IV.    The District Court Erred in Giving the Illustrative Example of Circumstantial Evidence in Ninth Circuit Model Criminal Jury Instruction 1.5, Where It Improperly Shifted the Burden to the Defendant to Provide Additional Evidence to Rebut a Default Inference. ...........................................................................................47

    A.    Standard of Review...................................................................47

    B.    Factual Background .................................................................47

      C.     The example in Ninth Circuit Model Criminal Jury Instruction 1.5—Direct & Circumstantial Evidence—improperly shifts the burden to the defendant to produce additional evidence to rebut a default inference. ......................48

    V.     Cumulative Error Warrants Reversal. ..................................................51

CONCLUSION .......................................................................................................53

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Burton v. Johnson*,
948 F.2d 1150 (10th Cir. 1991) ..........................................................25

*Cohn v. Papke*,
655 F.2d 191 (9th Cir. 1981) .............................................................45

*Dang v. Cross*,
422 F.3d 800 (9th Cir. 2005) .................................................... 48, 50

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ...........................................................................37

*Dyer v. Calderon*,
151 F.3d 970 (9th Cir. 1998) ..................................................... 14, 25

*Fields v. Brown*,
503 F.3d 755 (9th Cir. 2007) ..................................................... 24, 26

*Murphy v. Florida*,
421 U.S. 794 (1975) ...........................................................................24

*Neder v. United States*,
527 U.S. 1 (1999) ................................................................................50

*Old Chief v. United States*,
519 U.S. 172 (1997) .................................................................... 43, 44

*Sandstrom v. Montana*,
442 U.S. 510 (1979) .................................................................... 49, 50

*Shorter v. Baca*,
895 F.3d 1176 (9th Cir. 2018) ..........................................................47

*Skilling v. United States*,
561 U.S. 358 (2010) ...........................................................................24

*United States v. Candoli,*
    870 F.2d 496 (9th Cir. 1989) ....................................................... 33, 41

*United States v. Espinosa,*
    827 F.2d 604 (9th Cir. 1987) ...............................................................38

*United States v. Gadson,*
    763 F.3d 1189 (9th Cir. 2014) .............................................................33

*United States v. Gonzalez,*
    214 F.3d 1109 (9th Cir. 2000) ................................................... passim

*United States v. Gonzalez-Flores,*
    418 F.3d 1093 (9th Cir. 2005) .............................................................46

*United States v. Hitt,*
    981 F.2d 422 (9th Cir. 1992) ...............................................................45

*United States v. Ives,*
    609 F.2d 930 (9th Cir. 1979) ....................................................... 44, 45

*United States v. Kechedzian,*
    902 F.3d 1023 (9th Cir. 2018) ................................................... passim

*United States v. Martin,*
    796 F.3d 1101 (9th Cir. 2015) ..................................................... 42, 46

*United States v. Mejia,*
    545 F.3d 179 (2d Cir. 2008)................................................... 37, 38, 39

*United States v. Montoya-Gaxiola,*
    796 F.3d 1118 (9th Cir. 2015) .............................................................51

*United States v. Necoechea,*
    986 F.2d 1273 (9th Cir. 1993) .............................................................52

*United States v. Ness,*
    652 F.2d 890 (9th Cir. 1981) ...............................................................46

*United States v. Rivera*,
   43 F.3d 1291 (9th Cir. 1995) ...................................................... 38, 41

*United States v. Rodriguez*,
   971 F.3d 1005 (9th Cir. 2020) ............................................................33

*United States v. Savinovich*,
   845 F.2d 834 (9th Cir. 1988) ..............................................................45

*United States v. Warren*,
   984 F.2d 325 (9th Cir. 1993) .................................................... 47, 49

*White v. Ford Motor Co.*,
   312 F.3d 998 (9th Cir. 2002) ..............................................................48

**OTHER AUTHORITIES**

Ninth Circuit Model Crim. Jury Instr. 1.5, cmt. ....................................49

Seventh Circuit Pattern Instr. 2.03, cmt. ...............................................50

**RULES**

Fed. R. Evid. 401 ...................................................................................37

Fed. R. Evid. 403 ...................................................................................43

Fed. R. Evid. 702 ...................................................................................37

## INTRODUCTION AND ISSUES PRESENTED

Albert Pinedo is a 78-year-old man who has an atypical sexual interest in minors. After his 2003 conviction for distribution of child pornography, Pinedo served his prison sentence and underwent sex offender treatment. To avoid acting on his interests, Pinedo engaged in sexual fantasies involving age roleplay, wherein adults would pretend to be a different age.

In February 2020—seventeen years after his conviction—Pinedo posted an advertisement on Craigslist seeking "young men" and "twinks," a slang term that refers to gay men who appear younger. On that day, Special Agent Paul Radlinski was taking a class in undercover online investigations and went on Craigslist for a practice session. He stumbled upon Pinedo's post and chose to respond as a fictitious minor: "Robby Adams," a fourteen-year-old high school student from Long Beach, California.

From the very beginning, Pinedo was fully transparent with "Robby." He provided his real name, real phone number, and real email address. Pinedo and "Robby" communicated extensively over the course of the next week, with Pinedo asking "Robby" about various sexual activities. While Radlinski referenced "Robby's" age in several ways, he never sent Pinedo photos, as requested, and ignored Pinedo's initial requests to speak on the phone. When they finally did speak on the phone, Radlinski, a 42-year-old man, did not use a voice modification

device; rather, he tried to modulate his voice to sound like a teenage boy. Pinedo and "Robby" ultimately agreed to meet to engage in sexual activity. When Pinedo arrived at the meeting location, however, he was arrested and later charged with attempted enticement of a minor to engage in criminal sexual activity.

Pinedo's trial was an uphill battle. It was difficult to select jurors because so many people had strong, negative feelings about the allegations and even the idea of sexual fantasies involving age roleplay. Many of those people were excused, except for two who were seated and ultimately decided to convict Pinedo. The court gave the jury preliminary instructions to guide their processing of the evidence. One of those instructions defined circumstantial evidence—the main type of evidence in this case—and provided an illustrative example, which suggested that circumstantial evidence creates a default inference, and additional evidence is needed to depart from that inference. Moreover, the government called a veteran detective from another jurisdiction as an expert witness in online investigations, which bolstered Radlinski's testimony about his first major investigation, despite his missteps. Finally, the government introduced the actual sex toy and lubricant that Pinedo had in his car at the time of arrest, even though the government was already introducing testimony about and photos of the items. In the end, the jury convicted Pinedo.

These circumstances present the following issues on appeal:

1.     Whether a new trial is required where the district court declined to excuse for cause two prospective jurors who repeatedly expressed their biases against the subject matter of the case and Pinedo's anticipated defense, and never unequivocally stated they could be fair and impartial.

2.     Whether the district court abused its discretion in allowing a veteran law enforcement officer from another jurisdiction to testify as an expert in undercover online investigations, where his testimony served to bolster the credibility of the undercover investigator in this case.

3.     Whether the district court abused its discretion under Federal Rule of Evidence 403 in admitting the physical sex toy and bottle of lubricant, where the government was already introducing testimony about and photographs of the items, and the physical items, which had minimal probative value, were unduly prejudicial and needlessly cumulative

4.     Whether the district court erred in giving the optional illustrative example of circumstantial evidence from Ninth Circuit Model Criminal Jury Instruction 1.5, which improperly shifted the burden to the defendant to introduce additional evidence to rebut a default inference.

## STATEMENT OF JURISDICTION

The district court issued a judgment of conviction on October 29, 2021. (6-ER-1405) Pinedo filed a timely notice of appeal on November 3, 2021. (6-ER-1411) The district court had jurisdiction pursuant to 18 U.S.C. § 3231, and this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF BAIL STATUS

Albert Pinedo is presently in the custody of the Bureau of Prisons. His projected release date is September 9, 2028.

## FACTUAL AND PROCEDURAL HISTORY[1]

### I.    Trial Evidence

### A.    Individuals with an atypical sexual interest in minors engage in coping strategies to avoid acting on their sexual desires.

Dr. Drew Kingston testified at trial for the defense as an expert in paraphilia, or atypical sexual interests. (5-ER-944–45) Although Dr. Kingston did not evaluate Pinedo, he has extensive experience in researching, teaching about, and treating individuals, like Pinedo, who have atypical sexual interests. (5-ER-942–43) Paraphilia covers a wide range of unconventional sexual interests, including non-genital body parts, kinks, and minors. (5-ER-945–48)

---

[1] This section presents a brief statement of the case. Further factual background is presented in the Argument section.

There are various categories of age-based paraphilia. Ephebophilia is the interest in 15-to-17-year-olds; hebephilia is the interest in 11-to-14-year-olds; and pedophilia is the interest in 4-to-10-year-olds. (5-ER-946–48) An individual who has one of these age-based interests is known as a minor-attracted person ("MAP"). (5-ER-949) To be clear, paraphilia merely describes the atypical sexual interest; it becomes a disorder only when it causes harm or dysfunction. (e-ER-949)

To prevent their sexual interests from turning into a disorder—or a criminal offense—some MAPs engage in coping strategies. (5-ER-950–51) Such strategies include mental health treatment, support groups, religion, and fantasy and roleplay. (5-ER-950–51) Some MAPs are able to fulfill their sexual interests by watching legal pornography depicting adults who appear younger, so that MAPs can visualize a minor. (5-ER-951) Dr. Kingston testified that many people are attracted to 15-to-17-year-olds, so there is a wide array of legal pornography depicting "barely legal" adults or "twinks" (*i.e.*, gay slang term for younger-looking gay male). (5-ER-951)

MAPs may also participate in age play as a coping strategy. Age play is a form of roleplay wherein one participant (*i.e.*, usually the MAP) plays their own age, and the other individual pretends to be a different, often younger, age. (5-ER-952) In these instances, the fantasy is very important to fulfilling the sexual desire,

so the pretending individual must appear and feel real to be an acceptable alternative to an actual minor. (5-ER-952–53)

**B.    Pinedo posted an advertisement on Craigslist seeking sexual activity with "young men," which caught the attention of an undercover agent who was learning how to conduct undercover online investigations.**

Pinedo is a MAP who has undergone sex offender treatment. In 2003, Pinedo pleaded guilty to distribution of child pornography and served 64 months in federal prison, followed by 3 years of supervised release. (4-ER-747–49) As part of that sentence, Pinedo was ordered to participate in psychological counseling and sex offender treatment. (4-ER-749–50)

On February 26, 2020—approximately seventeen years after Pinedo's conviction—Pinedo posted an advertisement on Craiglist seeking a sexual encounter. (4-ER-756–57; 5-ER-1058–59) The post was titled, "Older Gentleman seeks activity partner M4M (Alhambra)," and read as follows:

> I'm a retired senior looking for casual contact with young men. On the DL, fit, ddf, discreet. I have a desire to service young skinny twinks. I give expert oral release, NSA. You must be in my local area (Alhambra) weekday mornings (10am-noon) ONLY! HMU to see if I'm what you need!

(5-ER-1059)[2] Pinedo's post did not refer to minors or any illegal activity.[3]

That day, Special Agent Radlinski of Homeland Security Investigations in Los Angeles was attending a training seminar for undercover online investigations of potential solicitors of minors. (4-ER-754–55) During the class, he went on Craigslist to practice and came upon Pinedo's post. (4-ER-756) Although by the time of trial, Radlinski had conducted about 50 to 60 online investigations, this was his first prosecution to come from an investigation. (4-ER-754) He decided to respond because the post mentioned the word "young" a couple of times and contained the term "skinny twinks." (4-ER-759–60) Radlinski assumed the identity of "Robby Adams," a fourteen-year-old high school student in Long Beach, California, and replied: "Hey, just saw your ad. I'm interested. What ages are you looking for?" (4-ER-760–61, 765–66)

Pinedo immediately responded to "Robby" with his actual phone number, but did not provide his desired age ranges. (4-ER-766–67) Radlinski did not respond, so Pinedo emailed "Robby" again to ask if he was interested in receiving

---

[2] Special Agent Paul Radlinski, the undercover agent in this case, testified that the terms in the Craigslist post are defined as follows: "DDF" means "drug and disease free"; "twinks" is a non-age-specific term that refers to a homosexual male with "boy-ish features or qualities"; "oral release" means "oral sex"; "NSA" means "no strings attached"; and "HMU" means "hit me up." (4-ER-758–59)

[3] Radlinski said he reviewed approximately 200 other Craigslist posts Pinedo had made, and none of them caused Radlinski to believe Pinedo was communicating with other minors. (4-ER-901–03)

oral sex. (4-ER-767) In that email, Pinedo included his real name (Albert) and again provided his real phone number. (4-ER-767) "Robby" then responded, "Hey, I'm new to all of this. Probably way too young for you anyway. I'm almost 15." (4-ER-767-68) After a few more emails, Pinedo wrote: "Robby, if in fact you are a minor, I just wanted to say that my ad was not intended for minors. You should not look there for sex. Try finding a peer for your sexual needs, that's more appropriate. Take care." (4-ER-772)

### C. Pinedo corresponds with "Robby" and asks for photographs, but Radlinski never sent any.

Over the next week, Pinedo and "Robby" exchanged approximately 470 emails, most of which were from Pinedo.[4] A lot of Pinedo's emails were sexual in nature, such as asking "Robby" if he wanted to receive oral sex and if he masturbated. (*See, e.g.*, 4-ER-770–71, 786–87, 800–01, 810–11, 814–15) Pinedo also asked "Robby" about himself and whether he struggled with being gay. (4-ER-783–86, 799)

Radlinski testified that he made sure to reinforce the theme of "Robby's" age throughout the course of communications with Pinedo. For instance, "Robby" told Pinedo that he was at his "nana's house" and his "dad [didn't] let [him] have

---

[4] The government introduced all of the communications between Pinedo and "Robby," which Radlinski read into the record. (*See* 4-ER-764–838) For the sake of brevity, Pinedo will not discuss all of these communications, but they are included in the excerpts of record for the Court's reference. (5-ER-1060–1164)

8

[his] phone" there. (4-ER-772–74) In another email, "Robby" discussed doing his algebra homework and said he was a freshman in high school. (4-ER-779–82) Pinedo responded to "Robby's" comments about his youth and at one point asked "Robby" if he was "a real boy or Pinocchio" because he "thought [he] might be the cops or the FBI tracking online pedophiles" and "wanted to be sure [he] wasn't in danger meeting [him.]" (4-ER-822–25)

Pinedo asked "Robby" to provide photos of himself. (4-ER-804) When subjects of investigations ask for photos, agents can send either their own childhood photos or electronically regressed photos. (4-ER-706–14, 860–61) However, Radlinski never sent Pinedo the photos he requested. (4-ER-804–05, 860–61) Radlinski acknowledged that he had access to software that could electronically regress his photos, but he did not avail himself of those tools. (4-ER-884)

### D.  Pinedo and "Robby" arrange to meet to engage in sexual activity.

Pinedo and "Robby" agreed to meet at a McDonald's in Long Beach. (4-ER-810–11) Pinedo offered to perform oral sex on "Robby" and said he would bring a sex toy and lubricant in case he wanted to use it. (4-ER-817–18) The meeting was to take place on a Wednesday morning, when "Robby" normally would have been at school. (4-ER-815–16)

9

### E. Pinedo speaks on the phone with Radlinski, who does not use a voice modification device to alter his deeper voice.

Pinedo asked "Robby" to talk on the phone, but Radlinski ignored Pinedo's initial requests. (4-ER-880–81) Finally, on the day Pinedo and "Robby" were supposed to meet, Pinedo and Radlinski spoke twice on the phone. (4-ER-838–40)[5] Radlinski did not use a voice modification device to alter his voice to sound like a juvenile. (4-ER-847) Instead, Radlinski, a 42-year-old man who has a fairly low voice, did his best to modulate his tone to sound like a 14-year-old boy who was going through puberty. (4-ER-838–40, 881–84)

During the call, Pinedo asked "Robby" what his birthday was. (4-ER-846) Although back in February, "Robby" had said he was "almost 15," Radlinski said his birthday was August 7th—five months later. (4-ER-883–84) He did not say the year because he could not calculate it quickly enough. (4-ER-883–84)

### F. Pinedo shows up to the meeting location and is arrested.

On the morning of the scheduled meeting, Pinedo traveled from Alhambra to Long Beach as planned, but Radlinski changed the location to a nearby Starbucks. (4-ER-832–33, 849–50) As Pinedo had told "Robby," he drove there in his black Lexus, brought along a sex toy and lubricant, and did not wear underwear. (4-ER-

---

[5] The audio recordings of the phone calls between Pinedo and Radlinski were introduced at trial and are subject to a concurrently filed motion to transmit physical exhibits to the Court.

817–18, 836–37; 5-ER-938–41) When Pinedo arrived in Long Beach, however, he was met by law enforcement officers who placed him under arrest and searched his car and person. (4-ER-813, 850) The government introduced at trial the physical sex toy and lubricant, as well testimony about and photos of the items. (5-ER-938–41; 6-ER-1385–89) Pinedo was subsequently charged with one count of attempted enticement of a minor to engage in criminal sexual activity (*i.e.*, oral copulation). (2-ER-18–20)

## II. Jury Verdict and Sentencing

The jury found Pinedo guilty of attempted enticement of a minor. (5-ER-1049; 6-ER-1390–91) Among those who found Pinedo guilty were two jurors who, during voir dire, expressed biases against the subject matter of the case and never unequivocally stated they could be fair and impartial. *See* Arg. I, *infra*.

Pinedo was subject to a mandatory minimum sentence of 120 months in prison. (6-ER-1397) At sentencing, the court said if it had had discretion, it would have imposed a lower sentence, given Pinedo's advanced age and other factors, but it could not do so. (6-ER-1397) The court, therefore, imposed the minimum 120-month sentence, followed by 5 years of supervised release. (6-ER-1398–99, 1405–10)

## SUMMARY OF THE ARGUMENT

1.      The United States Constitution guarantees criminal defendants a trial by a fair and impartial jury. If even one biased juror is seated on the jury, the defendant's conviction must be reversed, and the case remanded for a new trial, regardless of prejudice. During voir dire in this case, two jurors repeatedly expressed their biases against the subject matter of the charges and even Pinedo's anticipated defense. Neither juror unequivocally stated that they would set aside their personal feelings and remain fair and impartial. Despite their actual bias, the court denied the defense's for-cause challenges, and both jurors were seated on Pinedo's jury that convicted him. The district court, thus, abused its discretion in failing to excuse the biased jurors, requiring a new trial.

2.      It is improper for an expert witness to bolster another witness's credibility, particularly when the expert is a law enforcement officer who testifies to matters well within the comprehension of an average person. This case arose from Radlinski's first major undercover online investigation and, unsurprisingly, Radlinski made a few missteps. Before Radlinski testified, the government called Detective Wayne Nichols, a veteran officer from another jurisdiction, to testify as an expert in online investigations. Nichols's testimony preemptively bolstered the credibility of Radlinski's investigation. The district court abused its discretion in allowing Nichols to testify, warranting a new trial.

3.      Under Federal Rule of Evidence 403, a district court must exclude evidence whose probative value is substantially outweighed by the danger of unfair prejudice or the needless presentation of cumulative evidence. Here, the government sought to introduce evidence that Pinedo took a sex toy and a bottle of lubricant with him to the meeting with "Robby" to prove the "substantial step" element of attempted enticement of a minor. The government achieved its goal with testimony about the items recovered in Pinedo's car and photos of the items. The district court nevertheless allowed the government to introduce the physical sex toy and lubricant, even though the items had minimal probative value, and were unduly prejudicial and needlessly cumulative. The court abused its discretion, and this Court should reverse and remand for a new trial.

4.      The commentary to Ninth Circuit Model Criminal Jury Instruction 1.5— Direct and Circumstantial Evidence provides an illustrative example of circumstantial evidence that improperly shifts the burden to the defendant to produce evidence to rebut a conclusion. Indeed, the example suggests that circumstantial evidence yields a default inference, and additional evidence is needed to move beyond that inference. That is the example the court gave the jury in its preliminary instructions. Because the jury instruction misstates the law, and the jury's sole responsibility was to infer Pinedo's intent from a body of circumstantial evidence, a new trial is warranted.

## ARGUMENT

I.  **The District Court Abused Its Discretion, Where It Declined to Excuse for Cause Two Prospective Jurors Who Displayed Significant Bias Against the Subject Matter of the Charges and Pinedo's Anticipated Defense, and Never Unequivocally Stated That They Could Be Fair and Impartial.**

### A.    Standard of Review

A district court's ruling on actual juror bias is "reviewed for manifest error or abuse of discretion, because the determination of impartiality may be based on the district court's evaluation of a prospective juror's demeanor. A district court abuses its discretion when it bases a decision on an erroneous legal standard or a clearly erroneous finding of fact." *United States v. Kechedzian*, 902 F.3d 1023, 1027 (9th Cir. 2018) (internal citations and quotation omitted). "The presence of a biased juror cannot be harmless; the error requires a new trial without a showing of actual prejudice." *Dyer v. Calderon*, 151 F.3d 970, 973 n.2 (9th Cir. 1998) (en banc) (noting that seating of biased juror is structural error not subject to harmless error analysis).

### B.    Factual Background

Prospective juror #17 ("Juror 17") had very strong, negative feelings about the subject matter of this case. When Juror 17 was called for voir dire, the following exchange took place:

> Court:   I do understand the subject matter of this case is somewhat disturbing, these are—a lot of things we don't want to think about. The question is can you put aside

14

your personal feelings and consider the evidence and try to reach a verdict regardless of the consequences to one side or the other?

Juror 17:   Sure. Yeah, I would like to think I could. I have never done this before so, like, just reading the initial statement or whatever like that, I think it's hard to not have a visceral reaction to that, so I tried to answer as honestly as I could.

Court:   Let me ask you, also one of the answers you had to one of the questions is that you say that sexual fantasy and role playing is understandable; when children are involved, real or imagined, it feels wrong. Now, obviously feelings aren't the same thing as the elements of a crime. So, again, do you feel you could put your own feelings aside and just consider the elements of the case?

Juror 17:   I really don't know how to answer these questions. I would like to think—I don't know, I don't know. It's so hard with like—

Court:   Because you haven't experienced it, you don't know what your answer is going to be?

Juror 17:   In a way, it's really hard for me to answer. I don't know.

Court:   Let me ask you this question. If you had a situation where you had two adults, and they're in a situation where both adults pretend to be minors—

Juror 17:   Right.

Court:   Engage in sexual fantasy because of that, would you have a problem with that?

Juror 17:   I would obviously think it's gross, legally, it would be okay.

Court:      Okay. So in that situation, you could obviously separate your personal views from considering what the evidence would be in that type of situation?

Juror 17:   Right.

(3-ER-457–58)

During the defense's examination of Juror 17, the following exchange took place:

Defense:    The question—I know you probably filled out [the questionnaire] this morning but it's been a while, so the question was is there anything about the nature of this case that would interfere with your ability to be a fair and impartial juror in this case? You put yes, and that was true when you wrote it?

Juror 17:   Yes.

Defense:    It's true now?

Juror 17:   Pardon me, a lot of the questions, after reading them, a lot of them sounded the same in a way. So, I wasn't necessarily sure if I was—I would like to think I could be impartial, but from the reaction I got from reading the statement about the case, I was trying to be honest about the reaction I felt and things like that, maybe I was putting my feelings into those questions, which I probably should not have. But, I was just trying to answer them truthfully. It's just how I felt at the time. I might feel that way, but I don't know the details of this case. I'm sure there is a lot more than just that statement I read. I'm just going from what I saw.

Defense:    I appreciate it. . . . [T]his was actually the very first question you were asked about the case, about the specific—your reaction to it. So based on just hearing

16

reading [*sic*] the statement in the case, you felt you couldn't be impartial just hearing that?

Juror 17:    I read the statement and it said that there was an undercover officer that was involved, and so it sounded like the defendant was trying to approach what they assumed was a child, which was not, but so my initial reaction was, well, then why are we here, in a way. My first reaction, was well this doesn't, why are we here, if he was caught, and busted and things, I'm sure, like I said, I know there are plenty of circumstances around this thing, I don't know all the information. But just from that information I was given, I felt I had a reaction and that is just how I answered it.

Defense:    When you say, why are we here, your thought was they isn't this guy pleading guilty?

Juror 17:    Yeah. Like, why is there a trial, honestly.

(3-ER-460–62)

Juror 17 discussed his experience with friends who had been victims of sexual assault. First, Juror 17 mentioned that a close female friend had been raped by a famous comedian, who was not prosecuted. (3-ER-459–60) Second, he said that a close male friend had been sexually abused in Catholic school when he was very young. (3-ER-462–63) Defense counsel asked Juror 17 if these experiences would "weigh heavily" on him if he were seated as a juror in this case, and the following exchange took place:

Juror 17:        I would—probably, I mean, I guess, yeah, you know.
                And the reason I brought it up, like, the father of two small children and things like that, this past year

17

when I grew up my mom would just, like, pull me away from the pervert in church or whenever it was. But nowadays with the Internet and things like that, my kids, because they have been home the whole time, they are online a lot more, playing Roblox and Minecraft, or whatever it is, my wife and I have to be more conscientious about their dealings and goings on online trying to talk to them about what is out there, and who these people are.

People might not be who they say they are, and things like that. It's still something that my wife and I are trying to learn about. I'm not well versed in it, I didn't grow up with these things.

So, I can't imagine things like that wouldn't be on my mind somewhat.

I know that this trial is not about them and what has happened to them, it's about a completely different person and things like that. I don't know, it's hard to say. I have never been in a situation like this before, so I don't know how heavy it would weigh on my mind or not.

Defense:    And if you were in the defendant's position, given all of your experience and background, you wouldn't consider yourself a fair juror in this case, would you?

Juror 17:   If I was him in this room listening to me talk right now, I don't think I would be stoked, but, I would let him know that as a citizen of this country, I would do my best to try to be as impartial as I can be.

(3-ER-464–65)

Defense counsel then asked Juror 17 about his feelings regarding sexual fantasies and age roleplay. (3-ER-465) Juror 17 reiterated that when children are involved, real or imagined, that alone is "gross." (3-ER-465) Juror 17 elaborated:

I don't want to shame or anything like that, I know people have their thing. . . . [I]f two consenting adults get their rocks off by pretending

18

> to be teenagers or whatever it is, pretending to be minors or something like that, and there is consent there, gross, but do your thing. If one of the participants is not willing and doesn't know it's not a fully informed adult, yeah I have issue with it.

(3-ER-465–66)

The defense moved to excuse Juror 17 for cause. (1-ER-14) Defense counsel noted that Juror 17 "had a visceral reaction" to simply reading the statement of the case, did not know whether he could put his feelings aside, and had difficulty answering whether he could be fair. (1-ER-14) The court said, "This was the individual who is [a] bartender, and has children. I recall in the end, he said he could." (1-ER-14) Counsel reminded the court that Juror 17 "said why is there even a trial" and that if he were the defendant in this case, he "wouldn't be stoked" if he was a juror, but he "would do [his] best." (1-ER-14) The court responded, "Exactly. Next[,]" thus denying the defense's for-cause challenge. (1-ER-14) Juror 17 was ultimately seated on the jury. (4-ER-635)

Prospective juror #30 ("Juror 30") similarly had very strong, negative feelings about the subject matter of this case. On her questionnaire, Juror 30 wrote that "adults should not be engaged in coping strategies such as fantasies with minors." (3-ER-518) The court clarified that the fantasies did not involve minors, but were about minors, which "might very well be distasteful but that may not be a violation of the law." (3-ER-518–19) Juror 30 then said she understood the difference, but did not elaborate any further on her feelings about sexual fantasies

19

about minors, nor did the court follow up with further questions. (3-ER-519)

Instead, the court reviewed the principles of the government's burden of proof and

the presumption of innocence, which Juror 30 said she understood. (3-ER-519) The

court then asked Juror 30 whether there was anything in her background or

personal experience that would prevent her from being fair and impartial, and she

answered, "I don't think so." (3-ER-519–20)

During the defense's voir dire examination, Juror 30 revealed her negative

feelings about the subject matter of the case and Pinedo's anticipated defense. The

following exchange took place:

| | |
|---|---|
| Defense: | So, one of the issues that you may hear about in this case is that adults may engage in sexual fantasies where they are role playing. One of the adults is pretending to be a child. Do you have strong feelings about that that you think you would carry with you in this trial? |
| Juror 30: | I don't think adults should be, but— |
| Defense: | Okay. You don't think adults should be. Can you explain that a little bit? |
| Juror 30: | Well, a child is so innocent, why would you want to think about kids—innocent kids like that? *** I have two teenagers. *** I have nieces and nephews, they are teenagers. I do not want people to see them and fantasize about that. |
| Defense: | Thank you for explaining that. So given your feelings about your own children, and your nieces and nephews, do you think it would be difficult for you to be fair in this case, given the charges? |

20

Juror 30:     I don't know.

Defense:      You don't know. Well, what was your reaction when you
              read kind of the description of what the case is about?

Juror 30:     I think that is awful.

Defense:      Okay. Do you think that you would be able to have an
              open mind about that or is it just too strong for you to
              kind of put aside your feelings?

Juror 30:     Honestly, I think it's too strong for me.

Defense:      Just given the charge itself, you feel like your feelings
              about that charge are too strong and you wouldn't be able
              to put those feelings aside?

Juror 30:     I will try to, but I don't know.

(3-ER-520–22)

Defense counsel then previewed what the evidence at trial would be and
asked Juror 30: "So, it sounds like given your feelings about your own children and
about your niece and nephews, it would be difficult for you to look at charges like
that without being biased; is that right?" (3-ER-522) Juror 30 responded: "It would
be, yes. I would think so. *** I want not to be that." (3-ER-522–23) Counsel tried
to clarify Juror 30's feelings about the case, asking "[s]o, it sounds like even
though you want to be, you don't think you could be; is that right, could be fair?"
(3-ER-523) Juror 30 answered: "I don't know what to say *** Probably I wouldn't
be a good juror." (3-ER-523)

The court then attempted to rehabilitate Juror 30. The court said, "Well, let me ask you, you don't think you could be fair, is it a possibility you could be fair?" and Juror 30 answered, "I will try my best." (3-ER-523) The court asked, "And you will try to follow the Court's instructions on the law; is that correct?" and Juror 30 replied, "Yes." (3-ER-523) Juror 30 also said she did not have a problem with the presumption of innocence. (3-ER-523)

The government also attempted to rehabilitate Juror 30. The following exchange took place during the government's examination:

| | |
|---|---|
| Gov't: | You, in filling out the questionnaire, . . . you read about the nature of the case and then you answered that you can follow the Court's instructions about rendering—reaching a verdict solely based on evidence, and you said yes you could do that. |
| Juror 30: | Yes. |
| Gov't: | That was after you knew about what the charges were and everything like that, right? |
| Juror 30: | Uh-huh. |
| Gov't: | Do you still feel that way? Is that your answer? |
| Juror 30: | Why are you guys pressuring me[?] I don't know what to say. |
| Gov't: | These are hard questions. |
| Court: | There is no correct answer. |
| Gov't: | Just the truth is all we want. |

Juror 30:     Well, I will try my best.

(3-ER-524)

The defense moved to excuse Juror 30 for cause, given her initial response that she did not think she could be fair. (1-ER-15) Defense counsel noted that Juror 30 said she was feeling pressured, "indicating that she felt like she needed to give a correct answer that was not a truthful answer." (1-ER-15) Indeed, Juror 30 first said she could not be fair because of her own children, nieces, and nephews, but then in response to questioning from the court and the parties, was hesitant in saying she would try to be fair. (1-ER-15–16) The government countered that, in her questionnaire, Juror 30 said she could be fair and impartial, and the government "[thought] there were a handful of leading questions both ways and she would respond accordingly[.]" (1-ER-16) The government argued that there was no reason to believe Juror 30 "stepped off of [her] position" in the questionnaire. (1-ER-16) The court agreed with the government and denied the for-cause challenge. (1-ER-16) Juror 30 was ultimately seated on Pinedo's jury. (4-ER-635)

**C.    The district court was obligated to excuse the two biased jurors, given their actual biases and lack of unequivocal statements of impartiality.**

"The Sixth Amendment guarantees criminal defendants a verdict by an impartial jury, and the bias or prejudice of even a single juror is enough to violate

that guarantee." *Kechedzian*, 902 F.3d at 1027 (cleaned up); *see also Skilling v. United States*, 561 U.S. 358, 395–96 (2010) ("The seating of any juror who should have been dismissed for cause requires reversal.") (cleaned up) (internal quotation omitted). "Challenges for cause are the means by which partial or biased jurors should be eliminated. To disqualify a juror for cause requires a showing of either *actual* or *implied* bias[.]" *United States v. Gonzalez*, 214 F.3d 1109, 1111 (9th Cir. 2000) (emphasis in original). This case concerns actual bias.

Actual bias "stems from a pre-set disposition not to decide an issue impartially[.]" *Fields v. Brown*, 503 F.3d 755, 766 (9th Cir. 2007) (en banc). Such bias "is typically found when a prospective juror states that he can not [*sic*] be impartial, or expresses a view adverse to one party's position and responds equivocally as to whether he could be fair and impartial despite that view." *Id.* at 767. "In determining whether a district court has abused its discretion in refusing to remove a juror for actual bias, this [C]ourt accords significant weight to a juror's *definitive* statement that he can serve impartially. Nevertheless, 'the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights[.]'" *Gonzalez*, 214 F.3d at 1112 n.3 (quoting *Murphy v. Florida*, 421 U.S. 794, 800 (1975)) (emphasis added) (internal citation omitted).

To be clear, a prospective juror's commitment to lay aside personal biases and decide a case impartially must be *unequivocal* to pass constitutional muster. *Id.*

at 1113–14 (finding juror's equivocal responses and failure to affirmatively state she could be impartial required dismissal for cause). Accordingly, aspirational statements, such as, "I hope," "I'll try," or "I might be able to," are insufficient to meet the demands of the Sixth Amendment. *See, e.g.*, *id.* (finding juror's response, "I'll try," was equivocal and required dismissal for cause); *Kechedzian*, 902 F.3d at 1029–31 (finding juror's responses—"I might be able to put that aside" and "I would want to put my personal stuff aside, but I honestly don't know if I could"— were equivocal and required dismissal for cause). Where a juror's commitment to being fair and impartial is unclear, any "'[d]oubts regarding bias *must* be resolved *against* the juror.'" *Gonzalez*, 214 F.3d at 1114 (quoting *Burton v. Johnson*, 948 F.2d 1150, 1158 (10th Cir. 1991)) (emphasis added).

Here, the district court abused its discretion in failing to excuse for cause Jurors 17 and 30, who never affirmatively stated they could lay aside their personal beliefs and decide this case impartially. Because defense counsel could not exercise any peremptory challenges to excuse these biased jurors, they were ultimately seated on Pinedo's jury and participated in convicting him. The court's error, resulting in the seating of these two biased jurors, requires reversal of Pinedo's conviction and remand for a new trial. *See Dyer*, 151 F.3d at 973; *Gonzalez*, 214 F.3d at 1111, 1114.

25

As set forth above, Juror 17 repeatedly expressed his negative feelings about and disgust with the subject matter of this case. Juror 17 had a "visceral reaction" to reading the statement of the case and found Pinedo's anticipated defense—*i.e.*, that he was engaged in a sexual fantasy involving age roleplay—to be "gross." (3-ER-457–58, 465–66) Juror 17 also volunteered that his two close friends had been sexually assaulted—one of whom was sexually abused in Catholic school when he was a young boy—and he did not know "how heavy it would weigh on [his] mind" when deciding this case. (3-ER-459–60, 462–65) He also said that he had two young children who had been spending a lot of time online in the previous two years—*i.e.*, during the COVID-19 pandemic—and he and his wife were fearful of strangers lurking on the internet. (3-ER-464) This fear hits at the core of the allegations in this case—an adult who attempted to entice a minor to engage in sexual activity. Finally, Juror 17 found it important to mention that when he was a child, his mother would "pull [him] away from the pervert in church or whenever it was." (3-ER-464) Clearly, Juror 17—either through his explicit expressions of bias or through his other statements about the subject matter of the case—exhibited actual bias against Pinedo. *See Fields* 503 F.3d at 767.

In contrast to his repeated expressions of bias, Juror 17 never offered a firm commitment to set aside those feelings and remain fair and impartial in deciding this case. The closest Juror 17 came to stating as much was when the court asked

him *at the beginning* of voir dire whether he could set aside his personal feelings and consider the evidence "regardless of the consequences to one side or the other[.]" (3-ER-457) Juror 17 replied, "Sure. Yeah, *I would like to think I could*." (3-ER-457) (emphasis added) That is not an unequivocal statement of impartiality and fairness.

Further questioning revealed that Juror 17 actually could not set aside his feelings. Indeed, just a few exchanges later, the court asked Juror 17 whether he could set his feelings aside and consider the elements of the case, and Juror 17 responded, "I really don't know how to answer these questions." (3-ER-458) He later acknowledged that even in his written questionnaire, he said that the nature of the case would interfere with his ability to be fair and impartial. (3-ER-460–61) In fact, Juror 17 appeared to prejudge the case, questioning "why there is a trial, honestly," and why Pinedo had not pleaded guilty since "he was caught, and busted and things[.]" (3-ER-462) Finally, Juror 17 said that if he were the defendant listening to himself answer questions in voir dire, he "[didn't] think [he] would be stoked[.]" (3-ER-465) But he tried to appease Pinedo by saying he "would do [his] best to *try* to be *as impartial as [he] can be*." (3-ER-465) (emphasis added)

None of these were unequivocal statements to set aside personal feelings and decide the case impartially. At most, Juror 17 said he would "like to think [he] could" and "try to be" as impartial as he could be, but such aspirational responses

are insufficient. *See Gonzalez*, 214 F.3d at 1113 n.5; *Kechedzian*, 902 F.3d at 1029. And even if any of these came close to affirmative commitments to impartiality, they paled in comparison to Juror 17's repeated expressions of bias throughout voir dire. Because any lingering doubts about Juror 17's ability to be impartial *must* be resolved against him, *Gonzalez*, 214 F.3d at 1114, the court should have excused Juror 17 for cause.

The same is true for Juror 30. Juror 30 repeatedly expressed her negative feelings and biases about the allegations in this case and even Pinedo's anticipated defense. Juror 30 read the description of the case and found the allegations to be "awful." (3-ER-521) When asked about Pinedo's anticipated defense of sexual fantasies involving age roleplay, Juror 30 said "adults should not be engaged in coping strategies such as fantasies with minors." (3-ER-518) Although it appears as though Juror 30 was initially confused as to whether the fantasies were *with* minors as opposed to *about* minors, she still did not think it was appropriate. She said: "I don't think adults should be, but—*** Well, a child is so innocent, why would you want to think about kids—innocent kids like that? *** I have two teenagers. *** I have nieces and nephews, they are teenagers. *I do not want people to see them and fantasize about that*." (3-ER-521) (emphasis added)

Crucially, Juror 30 never unequivocally and affirmatively stated she would be able to set aside her personal feelings and decide the case impartially. Given her

personal beliefs and feelings, and obvious discomfort with the questions being asked of her, Juror 30 stated multiple times that she did not know whether she could be fair in this case and went so far as to say, "Probably I wouldn't be a good juror." (3-ER-521, 523) Defense counsel asked her if she could have an open mind at trial, or whether her feelings were too strong to do so, Juror 30 responded, "Honestly, I think it's too strong for me to. *** I will try to, but I don't know." (3-ER-522) While Juror 30 said she did not want to be biased, she agreed it would be very difficult to look at the allegations in this case without being biased, given her feelings about the children in her family. (3-ER-522–23) Defense counsel attempted to clarify Juror 30's responses, but she became frazzled and said, "I don't know what to say." (3-ER-523)

Neither the court's nor the government's attempts to rehabilitate Juror 30 yielded an unequivocal statement that she could be fair and impartial. Indeed, in response to the court's questions, Juror 30 said she would "try her best" to be fair and would "try to follow the Court's instructions on the law[.]" (3-ER-523) Then, when the government followed up, Juror 30 became increasingly uncomfortable, saying, "Why are you guys pressuring me. I don't know what to say." (3-ER-524) Juror 30 concluded her voir dire by stating, "Well, I will try my best." (3-ER-524) In the end, Juror 30, at most, said she would *try* to be impartial, but stopped short of unequivocally stating that she would be. That is insufficient to meet the

standards of the Sixth Amendment. *See Kechedzian*, 902 F.3d at 1029, 1031; *Gonzalez*, 214 F.3d at 1113–14. The court, thus, erred in failing to excuse Juror 30 for cause.

The fact that Juror 30 indicated on her written questionnaire that she would be able to follow the court's instructions is inconsequential. In response to the defense's for-cause challenge, the government pointed out Juror 30's written response. (1-ER-16; 3-ER-524) The government failed to mention, however, that Juror 30 acknowledged during voir dire that she would "*try* to follow the Court's instructions on the law[.]" (3-ER-523) (emphasis added) Nor did the government mention that when it asked Juror 30 whether she still felt the same way as when she responded to the written questionnaire, Juror 30 said, "Why are you guys pressuring me. I don't know what to say." (3-ER-524) Nevertheless, the court accepted the government's argument and denied the defense's for-cause challenge on this basis. (1-ER-16)

But, Juror 30's initial check mark next to "Yes" on the written questionnaire does not demonstrate an unequivocal commitment to impartiality, particularly in light of her subsequent expressions of bias and inability to set aside her personal feelings and decide the case impartially. (3-ER-524); *see Kechedzian*, 902 F.3d at 1031 (noting that juror's ability to follow principles of presumption of innocence and burden of proof did not mean she could be impartial; "A juror can understand

the presumption of innocence and burden of proof, yet still let personal prejudice infect her ability to be impartial."). Indeed, Juror 30's single initial response is no match for her subsequent repeated expressions of bias and stated inability to put aside her personal feelings. Importantly, there was no rehabilitation *after* Juror 30 expressed her bias. And, in any event, "[d]oubts regarding bias must be resolved against the juror." *Gonzalez*, 214 F.3d at 1114 (internal quotation omitted). In short, the district court abused its discretion in failing to excuse Juror 30 for cause, requiring reversal of Pinedo's conviction and remand for a new trial.

These conclusions are compelled by this Court's prior decisions in *Gonzalez* and *Kechedzian*. In *Gonzalez*, a cocaine distribution and money laundering case, one prospective juror's ex-husband had dealt illegal drugs, which was the cause of their divorce. *Gonzalez*, 214 F.3d at 1110–11. The juror was asked three times whether she could put aside her feelings about her husband and decide the case impartially, and the juror said, "I will try to, "Right. I'll try," and "I'll try"—in other words, "each time she responded equivocally. Not *once* did she affirmatively state that she could or would serve fairly or impartially." *Id.* at 1111, 1113 (emphasis in original). Despite further questioning, the juror did not deviate from her equivocal answers. This Court held that in light of a juror's inability "to state that she will serve fairly and impartially despite being asked repeatedly for such assurances, we can have no confidence that the juror will 'lay aside' her biases or

31

her prejudicial personal experiences and render a fair and impartial verdict." *Id.*
1114. This Court, accordingly, reversed and remanded for a new trial. *Id.*

Similarly, in *Kechedzian*, an identity theft case, one prospective juror had
gotten her social security number stolen five years earlier and expressed hesitation
to set aside those feelings and serve impartially. *Kechedzian*, 902 F.3d at 1026.
When asked about her ability to be impartial, the juror responded: "I might be able
to put that aside"; "I would want to put my personal stuff aside, but I honestly
don't know if I could"; and "I would try to be fair." *Id.* at 1026, 1029. This Court
found that these responses were "equivocal" and could not "be understood as
affirmative statements of impartiality." *Id.* at 1029–30. Thus, the court was
obligated to excuse her for cause under an actual bias theory. *Id.* at 1031.

This case is even more egregious than *Gonzalez* or *Kechedzian*. Those cases
each had only one juror who failed to unequivocally state they could be impartial,
and their personal feelings stemmed from their prior experiences with illegal drug
dealing and identity theft, respectively. Here, on the other hand, there were *two*
jurors who had significant emotional reactions and even disgust toward the subject
matter of the case and Pinedo's anticipated defense—feelings that could not easily
be discarded, as exhibited by their responses to further questioning. Certainly,
Jurors 17 and 30 are entitled to their personal beliefs and feelings, which several
other prospective jurors shared. The problem is that the other jurors were

dismissed, whereas Jurors 17 and 30 were not. They were seated on the jury that reviewed the evidence, evaluated Pinedo's defense, and ultimately convicted him. Their erroneous seating requires reversal and a new trial.

## II. The District Court Abused Its Discretion in Allowing a Detective From Another Jurisdiction to Testify as an Expert, Where His Testimony Served to Bolster the Credibility of the Undercover Agent in This Case.

### A. Standard of Review

This Court "review[s] a court's admission of expert testimony or lay opinion testimony for abuse of discretion." *United States v. Rodriguez*, 971 F.3d 1005, 1017 (9th Cir. 2020) (citing *United States v. Gadson*, 763 F.3d 1189, 1202, 1209 (9th Cir. 2014)). The erroneous admission of expert testimony requires reversal if "it is more probable than not that its admission materially affected the verdict." *United States v. Candoli*, 870 F.2d 496, 506 (9th Cir. 1989).

### B. Factual Background

On April 20, 2020, the government notified the defense that it intended to call Detective Wayne Nichols from the Henderson Police Department in Las Vegas, Nevada, as an expert witness. (2-ER-22) According to the government, Nichols was going to testify about: 1) background information on undercover online investigations; 2) online advertising; 3) the use of Craigslist to entice minors; 4) the steps and methodologies in undercover investigations; and 5) the steps solicitors take to avoid law enforcement. (2-ER-22, 26–29)

The defense moved to preclude Nichols from testifying, arguing that his proposed testimony was unreliable and irrelevant under Federal Rule of Evidence 702. (2-ER-22–25) Counsel also argued that Nichols was essentially serving as a third-party prosecutor to bolster the testimony of Special Agent Paul Radlinski, the undercover agent in this case. (2-ER-24, 61–63) The government argued, however, that Nichols's testimony would be helpful to the jury and was necessary because the defense was going to challenge the investigation performed in this case. (2-ER-39–44) The court denied the defense's motion, subject to a few conditions, such as requiring that Nichols testify before Radlinski, so that "if there [was] any bolsterism, . . . it [wouldn't] have that strong of an effect." (2-ER-67–68)

The parties then litigated the scope of Nichols's testimony. The government submitted an offer of proof with Nichols's proposed testimony, including undercover investigations on Craigslist, the use of coded language in posts, Craigslist's method of anonymized communication, and its system of flagging inappropriate content. (2-ER-115–18) The government said Nichols would not improperly bolster Radlinski's testimony, but corroborate it. (2-ER-128) The defense argued, however, that Nichols's testimony about proper undercover online investigations was merely an attempt to bolster the credibility of the case agent, who undoubtedly would explain the steps he took in the investigation. (2-ER-

123) Moreover, the rest of Nichols's proposed testimony was unnecessary or unsupported by data. (2-ER-121–22)

The court agreed with the government that Nichols's testimony would not improperly bolster Radlinski's. (2-ER-148) The court then held a *Daubert* hearing and ruled that Nichols would be allowed to testify about undercover investigations on Craigslist. (1-ER-2–5; 2-ER-243–79)

At trial, Nichols testified about his extensive experience in law enforcement. He worked as a police officer in Las Vegas for eighteen years, including seven and a half years as a detective conducting hundreds of undercover online investigations. (4-ER-682–86) From 2012 to 2019, Nichols gave about 85 presentations to law enforcement officials all over the world. (4-ER-686–87)

Nichols next testified about how Craigslist works and how individuals use the website to solicit minors for sexual activity. (4-ER-690–93) Nichols described his system of categorizing advertisements as "unambiguous"—where the poster makes his intent clear—and "ambiguous"—where the poster is not clear about his intentions. (4-ER-693–96) He said ambiguous posts often use code words, such as "twink"—the word found in Pinedo's initial post—which Nichols asserted is a slang term for a gay male who looks younger. (4-ER-696–97)

Then Nichols described the steps of a proper undercover online investigation. Nichols said he would first respond to the advertisement using

Craigslist's relay email system, which anonymizes the correspondents' email addresses, and make sure to include an age for the fictitious minor. (4-ER-697–99) The subject of the investigation would then set the pace of communication and would have to be the first to introduce the idea of sex and a potential meeting. (4-ER-699–700)

On cross-examination, defense counsel asked Nichols about some of the best practices he taught in his trainings. Nichols discussed the importance of having photographs ready to send in case the subject asks for them, and investigators should use their own childhood photos or electronically regressed images. (4-ER-707–10) The images were important only if available. (4-ER-709) He also discussed the use of a voice modification device to speak to subjects on the phone. (4-ER-716–19, 720–25) On re-direct examination, however, Nichols clarified that there is no protocol requiring an investigator to use photos or a voice modulation device. (4-ER-740–42)

Radlinski later testified about the steps of his investigation in this case, which generally lined up with Nichols's testimony about undercover investigations. (4-ER-754–55, 787–88, 804–05, 838–40) By the time of Pinedo's trial, Radlinski had performed 50 to 60 online investigations, but this was the first prosecution that resulted from one. (4-ER-754–55) Like Nichols, Radlinski explained how senders' email addresses are anonymized through Craigslist's relay

36

system, which he used to respond to Pinedeo's post. (4-ER-759–60, 765–66) He found Pinedo's Craigslist post to be "ambiguous" partly because it used the word "twinks." (4-ER-759–60) Radlinski acknowledged he failed to send Pinedo photos when requested and did not use a voice modification device when he spoke to Pinedo on the phone. (4-ER-858–63, 880–84)

### C.    The court should have precluded Nichols from testifying.

Under Rule 702 of the Federal Rules of Evidence, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion," provided the testimony meets certain criteria. Fed. R. Evid. 702. But, expert testimony is relevant only when the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993); *see also* Fed. R. Evid. 702; Fed. R. Evid. 401.

To determine whether expert testimony is admissible, courts should "refer to the traditional common law rule that expert testimony is called for when the untrained layman would be unable intelligently to determine the particular issue in the absence of guidance from an expert." *United States v. Mejia*, 545 F.3d 179, 189 (2d Cir. 2008) (internal quotations omitted); Fed. R. Evid. 702, Advisory Committee Notes ("There is no more certain test for determining when experts

may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.") (internal quotation omitted). "However, expert testimony may not appropriately be used to buttress credibility. . . . More particularly, an expert witness is not permitted to testify specifically to a witness' credibility or to testify in such a manner as to improperly buttress a witness' credibility." *United States v. Rivera*, 43 F.3d 1291, 1295 (9th Cir. 1995) (internal quotations omitted).

Courts have expressed hesitation about the treatment of law enforcement officers as "experts." Indeed, this Court has long urged district courts to use caution in admitting such "expert" testimony, because it "often carries an aura of special reliability and trustworthiness" based solely on the witness's status as a law enforcement officer. *United States v. Espinosa*, 827 F.2d 604, 613 (9th Cir. 1987), *cert denied*, 485 U.S. 968 (1988) (internal quotation omitted). "Any effective law enforcement agency will necessarily develop expertise on the criminal organizations it investigates, but the primary value of that expertise is in facilitating the agency's gathering of evidence, identification of targets for prosecution, and proving guilt at the subsequent trial." *Mejia*, 545 F.3d at 191. And, as the officer's "purported expertise" narrows from generalities "to the

criminality of the defendant, the officer's testimony becomes more central to the case, more corroborative of the fact witnesses, and thus more like a summary of the facts than an aide in understanding them." *Id.* at 190. The effect of this officer "expert" is to "displac[e] the jury by connecting and combining all other testimony and physical evidence into a coherent, discernible, internally consistent picture of the defendant's guilt." *Id.* at 190–91.

That is precisely the role Nichols, the law enforcement expert, played in this trial. Much of Nichols's testimony "addressed matters that the average juror could have understood had such factual evidence been introduced." *Id.* at 195. And, here, much of that factual evidence was introduced through Radlinski, the percipient witness. While the vast majority of Radlinski's direct examination was dedicated to reading every exchange between Pinedo and "Robby," the fictitious minor, Radlinski still described the inner workings of an undercover investigation, including his background and training, how to identify potential solicitors, how Craigslist anonymizes email addresses, how to allow the subject to set the tone and pace of communications, and how to respond to requests for photos and phone calls. (*See* 4-ER-751–54, 759–60, 765–66, 772, 787–88, 804–05, 838–40, 847) Simply put, Nichols was not a necessary or helpful "expert" witness in this case.

More importantly, though, Nichols's testimony improperly bolstered the credibility of Radlinski's investigation, which the government inadvertently

acknowledged. Indeed, in its opposition to the defense's motion to exclude Nichols, the government said Nichols's testimony was necessary to "[p]rovid[e] the jury with a framework to understanding the steps in an online undercover investigation" because "[d]efense counsel [was] certain to *attack the government's undercover investigation*." (2-ER-41) (emphasis added) The government certainly knew that this case arose from Radlinski's first major undercover investigation, (4-ER-754), so it likely wanted to ward off the defense's legitimate challenges to the investigation, such as Radlinski's failure to send photos when Pinedo asked for them or to use a voice modification device during the phone calls with Pinedo, (4-ER-858–63, 880–82).

By calling Nichols as an expert in undercover investigations—matters that the average juror could have easily understood and that Radlinski could, and did, testify to—the government was able to reassure the jury that Radlinski's first investigation bore the stamp of approval of a veteran detective. And, the fact that the court required Nichols to testify before Radlinski—in an effort to minimize any bolstering—actually exacerbated the problem. (2-ER-67–68) The government was able to set the stage for the jury to accept the credibility of Radlinski as the government's main witness. By the time Radlinski testified, the jury had already heard from Nichols that photographs and voice modification devices were not crucial to an investigation—points that were central to Pinedo's defense. And, in

its rebuttal argument, the government excused Radlinski's failure to send the requested photographs by invoking Nichols's testimony that photographs were "not a requirement" in every case and that it was "not a breach in some protocol" to fail to send photos. (6-ER-1034) The government likewise referred to Nichols's testimony when discussing Radlinski's failure to use a voice modification device. (6-ER-1036) Simply put, Nichols improperly bolstered Radlinski's credibility. *See Rivera*, 43 F.3d at 1295.

The court's error in allowing Nichols to testify was not harmless. *See Candoli*, 870 F.2d at 506. The sole issue before the jury was whether Pinedo believed "Robby" was an actual minor or an adult engaging in a sexual fantasy involving age roleplay. Radlinski was the sole percipient witness in this case, and his investigation—focused on gathering evidence to be used at a subsequent prosecution—was the primary evidence subject to adversarial testing. Therefore, Radlinski's credibility, including the steps he took and failed to take in his investigation, were central to this case. Nichols's "expert" testimony significantly buttressed Radlinski's credibility and allowed the jury to accept the investigation as proper, despite Radlinski's missteps that went directly the main issue. In other words, Radlinski's failure to send photos upon request and failure to use a voice modification device on the phone calls—allowing Pinedo to hear Radlinski's deeper voice—supported Pinedo's belief that he was communicating with an adult.

The court's erroneous admission of Nichols's expert testimony warrants reversal and a new trial.

### III. The District Court Abused Its Discretion in Admitting the Physical Sex Toy and Bottle of Lubricant, Where the Items' Minimal Probative Value Was Substantially Outweighed by Their Prejudicial Effect and Cumulative Nature.

#### A. Standard of Review

This Court reviews the district court's evidentiary ruling for an abuse of discretion. *United States v. Martin*, 796 F.3d 1101, 1105 (9th Cir. 2015). The Court will vacate the defendant's conviction if an adverse evidentiary ruling more likely than not affected the verdict. *Id.*

#### B. Factual Background

At the final pretrial hearing, defense counsel objected to the government's introduction of the physical exhibits of the sex toy (*i.e.*, a dildo) and a bottle of lubricant that were recovered from Pinedo's car. (1-ER-10) Counsel argued that the photos of the items were sufficient, and the items themselves were inflammatory. (1-ER-10)

The government said it was its burden to prove Pinedo took a substantial step toward committing the enticement offense, and those were the items Pinedo took to the meeting. (1-ER-11) Accordingly, the government was entitled to introduce the items as they were collected. (1-ER-11)

The court overruled the defense's objection. (1-ER-11) The court said it did not find the items "so prejudicial," such that the mere sight of them in person versus their appearance in a photograph would be "so inflammatory that it would somehow significantly alter the trajectory of the case." (1-ER-11)

At trial, Special Agent Derek Baker, who was part of the team that arrested Pinedo, testified about his search of Pinedo's car and recovery of the sex toy and lubricant. (5-ER-936–41) The government first introduced the actual sex toy and lubricant found in Pinedo's car, and shortly thereafter introduced photos of the items in the locations they were found—the sex toy in the glove box and the lubricant in the center console. (5-ER-938–41; 6-ER-1385–89)

### C. The physical sex toy and lubricant should have been excluded under Federal Rule of Evidence 403.

Federal Rule of Evidence 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged," such as "'suggest[ing] decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Old Chief v. United States*, 519 U.S. 172, 180 (1997) (quoting Advisory Committee's Notes on Fed. R. Evid. 403). "Cumulative evidence

replicates other admitted evidence." *United States v. Ives*, 609 F.2d 930, 933 (9th Cir. 1979).

The physical sex toy and lubricant had minimal, if any, probative value. In determining the probative value of evidence, the United States Supreme Court has counseled: "If an alternative [piece of evidence] were found to have substantially the same or greater probative value but a lower danger of unfair prejudice, sound judicial discretion would discount the value of the item first offered and exclude it if its discounted probative value were substantially outweighed by unfairly prejudicial risk." *Old Chief*, 519 U.S. at 182–83. In other words, the probative value of an objectionable item would be diminished by alternative items that accomplish the same goal.

Here, the government introduced evidence of the sex toy and lubricant to prove that Pinedo took a "substantial step" toward committing the enticement offense. (1-ER-11; 2-ER-20) The government was already introducing photos of the items, which were even more probative than the physical items themselves because the photos showed the items in the setting in which they were recovered—*i.e.*, in Pinedo's car. (5-ER-938–41; 6-ER-1385–89) That alone is sufficient to prove the "substantial step" element and greatly diminishes the probative value of the physical items. *Old Chief*, 519 U.S. at 182–83.

44

In contrast to the items' minimal probative value, the physical sex toy and lubricant were unduly prejudicial and unnecessarily cumulative. "Evidence creates unfair prejudice to the extent that the jury responds negatively to some aspect of the evidence unrelated to its tendency to make the contested fact more or less probable." *United States v. Savinovich*, 845 F.2d 834, 837 (9th Cir. 1988). Unfair prejudice arises from items that "often have a visceral impact that far exceeds their probative value." *United States v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992). And, "[w]here the evidence is of very slight (if any) probative value, it's an abuse of discretion to admit it if there's even a modest likelihood of unfair prejudice[.]" *Id.*

The government's display of a sex toy and bottle of lubricant in a courtroom certainly had "a visceral impact that far exceed[ed]" the probative value of items, *id.*, which were already depicted in photo exhibits and described by Special Agent Baker, who recovered them. The physical items were inflammatory and undoubtedly caused the jury to react negatively, particularly where the items were associated with homosexual activities and sexual fantasies, including age roleplay. *See Cohn v. Papke*, 655 F.2d 191, 194 (9th Cir. 1981) (noting the "clear potential that the jury may [be] unfairly influenced by whatever biases and stereotypes they might hold with regard to homosexuals or bisexuals or individuals who had 'vivid sexual fantasies'"). Additionally, these physical items were unnecessarily cumulative. *See Ives*, 609 F.2d at 933; *United States v. Ness*, 652 F.2d 890, 893

(9th Cir. 1981) (finding district court properly excluded physical evidence as cumulative, where witnesses had already testified about its contents). The minimal probative value of the sex toy and lubricant were substantially outweighed by the danger of unfair prejudice and the needless presentation of cumulative evidence, and thus, should have been excluded under Rule 403.

Although the display of the sex toy and lubricant may have been brief, the introduction of the items still more than likely affected the verdict. *Martin*, 796 F.3d at 1105; *see also United States v. Gonzalez-Flores*, 418 F.3d 1093, 1099 (9th Cir. 2005) (finding that, even though government "did not devote a great deal of time to the [prejudicial evidence], the testimony presented certainly could have prejudiced [defendant] unfairly"). The government even discussed the "dildo" in its closing argument. (5-ER-996, 1033, 1045) These were not business records, or even drug paraphernalia or firearms, which people may see relatively often, whether in real life or in television and films. These were a "dildo" and a bottle of lubricant—items that most people keep hidden, even in the privacy of their homes. The display of these items in open court certainly had a lasting impact, particularly where the jury may have imagined Pinedo using those items on an actual minor, despite Pinedo's belief that he was meeting with a roleplaying adult. This Court should reverse Pinedo's conviction and remand for a new trial.

**IV.    The District Court Erred in Giving the Illustrative Example of Circumstantial Evidence in Ninth Circuit Model Criminal Jury Instruction 1.5, Where It Improperly Shifted the Burden to the Defendant to Provide Additional Evidence to Rebut a Default Inference.**

**A.    Standard of Review**

This Court reviews de novo whether a jury instruction accurately states the law. *Shorter v. Baca*, 895 F.3d 1176, 1182 (9th Cir. 2018). "Use of a model jury instruction does not preclude a finding of error." *United States v. Warren*, 984 F.2d 325, 327 n.3 (9th Cir. 1993).

**B.    Factual Background**

The court gave the parties proposed preliminary jury instructions, including one on circumstantial evidence with an illustrative example involving wet pavement. (3-ER-337) Defense counsel objected, arguing that the example was unconstitutional because it created a rebuttable presumption that impermissibly shifted the burden to the defendant. (3-ER-338–40) The defense proposed an alternative instruction that accurately reflected the law and made it clear to the jurors that they could draw multiple inferences from the same evidence, without a default conclusion. (3-ER-338)

At the final pretrial hearing, the court indicated it would give the Ninth Circuit's model instruction on circumstantial evidence. (1-ER-7) Defense counsel renewed their objection, which the court overruled because it was giving the model instruction. (1-ER-7–8) The court said the illustrative example was "de minimus"

47

and "harmless enough," and told counsel they would have to "take up that argument" with the Ninth Circuit. (1-ER-8)

Before the parties gave their opening statements, the court gave the jury the following preliminary instruction:

> Evidence may be direct or circumstantial. Direct evidence is proof of a fact, such as testimony by a witness about what that witness personally saw or her or did. Circumstantial evidence is indirect evidence, that is, it is proof of one or more facts from which one can find another fact.
> By way of example, if you wake up in the morning and see that the sidewalk is wet, you may find from that fact that it rained during the night. However, other evidence, such as a turned-on garden hose, may provide an explanation for the water on the sidewalk. Therefore, before you decide that a fact has been proven by circumstantial evidence, you must consider all the evidence in the light of reason, experience, and common sense.

(1-ER-9; 3-ER-656–57) Later, after closing arguments, the court again instructed the jury on circumstantial evidence, but without reciting the example. (5-ER-977–78)

### C. The example in Ninth Circuit Model Criminal Jury Instruction 1.5—Direct & Circumstantial Evidence—improperly shifts the burden to the defendant to produce additional evidence to rebut a default inference.

"'[J]ury instructions must fairly and adequately cover the issues presented, must correctly state the law, and must not be misleading.'" *Dang v. Cross*, 422 F.3d 800, 804 (9th Cir. 2005) (quoting *White v. Ford Motor Co.*, 312 F.3d 998,

1012 (9th Cir. 2002)). "Use of a model jury instruction does not preclude a finding of error." *Warren*, 984 F.2d at 327 n.3.

The optional illustrative example in Ninth Circuit Model Criminal Jury Instruction 1.5 on circumstantial evidence is erroneous, as it essentially creates a rebuttable presumption, which impermissibly shifts the burden to the defendant to provide alternative explanations to rebut the most obvious or default inference. The Constitution mandates permissive inferences rather than presumptions. *Sandstrom v. Montana*, 442 U.S. 510, 515-17 (1979). A jury instruction that the jury may interpret "as constituting . . . a burden-shifting presumption" violates a defendant's right to due process and is unconstitutional. *Id.* at 524.

The example in Model Instruction 1.5 uses the inference "that it rained during the night" as the default conclusion arising from the mere fact someone woke up and saw the sidewalk was wet. Ninth Circuit Model Crim. Jury Instr. 1.5, cmt. The phrasing of the remainder of the example—*i.e.*, "However, *other evidence*, such as a turned-on garden hose, may provide an explanation for the water on the sidewalk," *id.* (emphasis added)—suggests that the defendant bears the burden of producing "other evidence" to depart from the default conclusion "that it rained."

In other words, the example may create the impression that circumstantial evidence may give rise to a presumption, and it is, thus, the defendant's burden to

49

introduce additional evidence to rebut that presumption. Such an instruction does not accurately state the law; rather, it is unconstitutional. *See Dang*, 422 F.3d at 804 (noting that jury instructions must accurately state the law); *Sandstrom*, 442 U.S. at 524 (finding that jury instruction that may be interpreted as shifting burden to defendant is unconstitutional).

The various reasonable inferences the jury may draw from the same set of facts are matters best left for attorney argument. Indeed, the parties ask the jury to reach different conclusions from the same evidence, and then it is the jury's responsibility to assess the evidence and draw its own inferences. *Cf.* Seventh Circuit Pattern Instr. 2.03, Direct and Circumstantial Evidence, cmt. (noting that committee chose not to include an illustrative example, such as the one here, because "[e]xamples of this sort may be too simplistic to illustrate the definitions in a given case, and they omit the fact that more than one conclusion may be drawn from circumstantial evidence," and such matters may be more appropriate for attorney argument). The Ninth Circuit's model illustrative example, therefore, inaccurately describes what circumstantial evidence is and, importantly, how it factors into the jury's evaluation of the evidence.

The erroneous circumstantial evidence instruction was not harmless. An erroneous instruction is harmless if "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Neder v. United*

*States*, 527 U.S. 1, 15 (1999) (internal quotation omitted); *see also United States v. Montoya-Gaxiola*, 796 F.3d 1118, 1124 (9th Cir. 2015). The jury's assessment of the central issue here—*i.e.*, whether Pinedo believed "Robby" was actually a minor—depended entirely on circumstantial evidence. That is, because Pinedo exercised his constitutional right not to testify, there was no direct evidence of Pinedo's subjective belief. Therefore, the jury had to infer Pinedo's belief based on circumstantial evidence.

Indeed, the parties' closing arguments focused on the same set of circumstantial evidence—with the government arguing that the jury could infer Pinedo's criminal intent, and the defense arguing that the jury could infer Pinedo believed "Robby" was another adult engaged in a sexual fantasy involving age roleplay. (5-ER-1003–07, 1015–16, 1021–29) Thus, the circumstantial evidence instruction—particularly the illustrative example—told the jury how to evaluate the entire body of evidence, thus contributing to the verdict. The erroneous instruction was not harmless beyond a reasonable doubt, and this Court should reverse Pinedo's conviction and remand for a new trial.

## V.     Cumulative Error Warrants Reversal.

To the extent any of the trial errors discussed in Arguments II, III, and IV, *supra*, might be considered harmless, the cumulative effect of Nichols's improper

expert testimony, the erroneous introduction of the physical sex toy and lubricant, and the erroneous circumstantial evidence instruction certainly supports reversal. *See United States v. Necoechea*, 986 F.2d 1273, 1283 (9th Cir. 1993).

## CONCLUSION

For the foregoing reasons, Albert Pinedo respectfully requests that this Court reverse his conviction and remand for a new trial, pursuant to Arguments I, II, III, or IV—either individually or cumulatively.

Dated: September 23, 2022          Respectfully submitted,

CUAUHTEMOC ORTEGA
FEDERAL PUBLIC DEFENDER


By: /s/ *Michael Gomez*
      Michael Gomez
      Counsel for Defendant-Appellant
      Albert Pinedo

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 21-50242

The undersigned attorney or self-represented party states the following:

( • ) I am unaware of any related cases currently pending in this court.

( ) I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

( ) I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/ Michael Gomez          **Date** | Sep 23, 2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17** *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 21-50242 |

I am the attorney or self-represented party.

**This brief contains** | 12,433 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

( • ) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ( ) it is a joint brief submitted by separately represented parties;

    ( ) a party or parties are filing a single brief in response to multiple briefs; or

    ( ) a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated |        | .

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Michael Gomez | **Date** | Sep 23, 2022 |

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*