## No. 21-50242

**IN THE**
# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
——————

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

ALBERT PINEDO,
*Defendant-Appellant*.

——————

On Appeal from the United States District Court
for the Central District of California, No. 2:20-cr-00148-GW
Honorable George H. Wu

——————

# APPELLANT'S PETITION FOR
# PANEL REHEARING AND REHEARING EN BANC
——————

CUAUHTEMOC ORTEGA
FEDERAL PUBLIC DEFENDER
  CENTRAL DISTRICT OF CALIFORNIA
MICHAEL GOMEZ
321 East 2nd Street
Los Angeles, California 90012
(213) 894-2854
Michael_Gomez@fd.org

*Counsel for Defendant-Appellant Albert Pinedo*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................1

STATEMENT ....................................................................................3

    I.    Trial Proceedings...................................................................3

    II.    Direct Appeal Proceedings....................................................8

REASONS FOR GRANTING THE PETITION ....................................10

    I.    The Majority's Decision Contradicts Supreme Court and Ninth Circuit Precedent. ................................................................10

        A.    The majority's failure to consider all of Jurors 17 and 30's statements of disqualifying bias during oral voir dire contradicts Supreme Court precedent. ....................................11

        B.    The majority's decision that Jurors 17's equivocal statements met this Court's threshold is contrary to the very precedent it cites........................................................................14

        C.    The majority's reliance on the written questionnaires is misplaced. ..............................................................................15

        D.    The majority's affirmance regarding Juror 30 is contrary to precedent requiring doubts to be resolved against the juror.....16

    II.    This Case Involves an Exceedingly Important Question Regarding Biased Juror Claims That Must Be Resolved to Avoid Eroding the Sixth Amendment's Right to an Impartial Jury. ................................17

CONCLUSION ....................................................................................19

CERTIFICATE OF COMPLIANCE

ADDENDUM — MEMORANDUM DISPOSITION

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Fields v. Brown,*
    503 F.3d 755 (9th Cir. 2007) .......................................................... 10, 16

*Hughes v. United States,*
    258 F.3d 453 (6th Cir. 2001) .......................................................... 16, 18

*McDonough Power Equipment, Inc. v. Greenwood,*
    464 U.S. 548 (1984) ...................................................................... 10, 16

*Skilling v. United States,*
    561 U.S. 358 (2010) .......................................................... 10, 11, 12, 13

*Smith v. Phillips,*
    455 U.S. 209 (1982) ...................................................................... 10, 16

*United States v. Allsup,*
    566 F.2d 68 (9th Cir. 1977) ...................................................................10

*United States v. Gonzalez,*
    214 F.3d 1109 (9th Cir. 2000) ........................................... 10, 13, 14, 17

*United States v. Kechedzian,*
    902 F.3d 1023 (9th Cir. 2018) .................................................... 10, 14

# INTRODUCTION

"[W]hy are we here, if he was caught, and busted and things[.] *** *why is there a trial, honestly*."

"I don't think I would be stoked [if I were the defendant hearing my answers], but, I would let him know that as a citizen of this country, I would do my best to *try* to be *as impartial as I can be*."

"Honestly, I think it's *too strong for me* [to put aside my feelings]."

"It would be yes [difficult to look at the charges without being biased.]"

"I will *try* my best."

"*Probably I wouldn't make a good juror*."

These were just some of the statements from two prospective jurors who were ultimately seated on Albert Pinedo's jury and convicted him.

\* \* \* \* \*

As Judge Bennett wrote in his dissent in this case, "the most priceless safeguard for the preservation . . . of individual liberty and of the dignity and worth of every man . . . is that of trial by jury.'" (App. 17a) (quotation omitted) Indeed, the right to an impartial jury is one of the most fundamental features of the American criminal justice system.

In this case, though, the majority's decision has rendered that right meaningless. The majority found the district court did not abuse its discretion in

refusing to excuse for cause Jurors 17 and 30—the two jurors in question. In so finding, the majority has gone against Supreme Court and this Court's precedent. It failed to consider the record as a whole, as the Supreme Court has instructed, and instead selected a couple of the jurors' statements that appear to support its decision. Even those statements, which the majority presumably believes are the strongest, fail to satisfy this Court's clear precedent. In the end, the majority has left a dangerous roadmap for how biased jurors may end up on a jury.

Judge Bennett, on the other hand, authored a lengthy dissent, concluding that the district court made a clear factual error when it declined to excuse a juror who expressed several disqualifying biases but failed to provide a subsequent unequivocal commitment to remain impartial. Despite believing that the evidence against Pinedo was overwhelming, Judge Bennett would have reversed and remanded for a new trial, as that is what the Sixth Amendment and precedent *require*: "Regardless of the crime charged and evidence against him, a defendant is entitled to a fair trial by an impartial jury." (App. 17a) That did not happen here.

For the following reasons, the Court should grant panel rehearing or rehearing en banc.

## STATEMENT

### I.    Trial Proceedings

In February 2020, Albert Pinedo published a post on Craigslist seeking a sexual encounter with "young men" and "twinks."[1] (App. 2a; 5-ER-1059) Special Agent Paul Radlinski of Homeland Security Investigations in Los Angeles responded to Pinedo's post as a fictitious 14-year-old named "Robby." (App. 2a) Over the next month, Pinedo and "Robby" exchanged numerous emails and made plans to meet to engage in sexual activity. (App. 2a) When Pinedo arrived for the meeting, Pinedo was arrested and subsequently charged with one count of attempted enticement of a minor to engage in sexual activity, in violation of 18 U.S.C. § 2422(b). (App. 2a) Pinedo argued that he was engaged in a consensual sexual fantasy involving age roleplay with an adult pretending to be a minor—a common coping mechanism for minor-attracted persons to avoid acting on their sexual desires and committing a crime. (4-ER-749-50, 950-53)

The process for selecting a jury proceeded as follows: Prospective jurors first "privately filled out a 69-question form, which was formulated by the parties and included questions specific to the case." (App. 3a) The last four questions on the questionnaire were generic fairness-related questions that asked about the juror's commitment to impartiality. (SER-13-14, 29-30) The jurors signed the

---

[1] "Twink" is a slang term for a gay male who looks younger. (4-ER-696-97)

questionnaires under penalty of perjury and declared their answers were true to the best of their knowledge. (App. 3a) After an initial review to remove disqualified jurors, the remaining veniremembers were brought into court individually for oral voir dire. (App. 3a)

Prospective juror #17 ("Juror 17"), "a father of two young children" had a "visceral reaction" to the "disturbing subject matter" of this case. (SER-5; 3-ER-457)[2] He checked "yes" on the question asking if there was anything about the nature of the case that would interfere with his ability to be impartial. (SER-5) He wrote that "sexual fantasy . . . when children are involved (real or imagined) it feels wrong." (SER-7) (SER-8) At the end of the questionnaire, Juror 17 placed checkmarks agreeing with the generic fairness-related questions. (SER-13-14)

During oral voir dire, the court asked Juror 17 if he could put aside the aforementioned feelings about the case, he answered: "Sure. Yeah, I would like to think I could. *** I really don't know how to answer these questions. I would like to think—I don't know, I don't know. It's so hard with like— *** In a way, it's really hard for me to answer. I don't know." (3-ER-457-58)

Defense counsel asked Juror 17 if he still believed the nature of the case interfered with his ability to be impartial, as he indicated on his questionnaire, and

---

[2] For the sake of brevity, Pinedo does not include a comprehensive review of the facts regarding jury selection. (*See* AOB 14-23 & GAB 8-15 for complete recitation of facts)

Juror 17 responded: "I would like to think I could be impartial, but from the reaction I got from reading the statement about the case, I was trying to be honest about the reaction I felt[.]" (3-ER-460) Juror 17 then said: "[M]y initial reaction was, well, then why are we here, in a way. My first reaction, was well this doesn't, why are we here, if he was caught, and busted and things[.]" (3-ER-462) Counsel asked if Juror 17 meant why was the defendant not pleading guilty, and he answered, "Yeah. Like, why is there a trial, honestly." (3-ER-462)

Juror 17 then discussed his experience with friends who had been victims of sexual assault, one of whom was a close male friend who had been abused in Catholic school. (3-ER-462-63) Juror 17 "guess[ed]" those experiences "probably" would "weigh heavily" on him. (3-ER-464) Unprompted, Juror 17 then mentioned how is mother would "pull [him] away from the pervert in church" and how he and his wife were fearful of strangers lurking on the internet because they had "two small children." (3-ER-462-63) Although Juror 17 understood this trial was not about them, he "[could]n't imagine things like that wouldn't be on [his] mind somewhat" or "how heavy it would weigh on [his] mind or not." (3-ER-464-65)

Counsel then asked Juror 17 if he were in Pinedo's position, how he would feel listening to his comments, and Juror 17 said, "I don't think I would be stoked, but, I would let him know that as a citizen of this country, I would do my best to try to be as impartial as I can be." (3-ER-465)

The defense moved to excuse Juror 17 for cause. (1-ER-14) The court said, "I recall in the end, he said he could." (1-ER-14) Counsel said Juror said he "would do [his] best." (1-ER-14) The court responded, "Exactly. Next[,]" thus denying the defense's for-cause challenge. (1-ER-14) Juror 17 was ultimately seated on the jury. (4-ER-635)

Prospective juror #30 ("Juror 30"), a 52-year-old mother of two teenagers, similarly had very strong, negative feelings about the subject matter of this case. On her questionnaire, she wrote that "[a]dult[s] should not be engage[d] in coping strategies such as fantasy with minors." (SER-24) She agreed with three of the generic fairness-related questions at the end of the form, but checked "yes" on the question asking if there was anything she wanted to bring to the court's attention that may affect her ability to be fair and impartial. (SER-29-30)

During oral voir dire, defense counsel questioned Juror 30 about her feelings about sexual fantasies involving minors. Juror 30 said: "I don't think adults should be, but— *** Well, a child is so innocent, why would you want to think about kids—innocent kids like that? *** I have two teenagers. *** I have nieces and nephews, they are teenagers. I do not want people to see them and fantasize about that." (3-ER-521) Counsel asked Juror 30 whether she could keep an open mind, or whether the subject matter was "too strong" for her to put aside her feelings, and Juror 30 answered, "Honestly, I think it's too strong for me. *** I will try to, but I

don't know." (3-ER-520-22) Counsel tried to clarify Juror 30's feelings about the case, asking "[s]o, it sounds like even though you want to be, you don't think you could be; is that right, could be fair?" (3-ER-523) Juror 30 answered: "I don't know what to say *** Probably I wouldn't be a good juror." (3-ER-523)

The court then attempted to rehabilitate Juror 30. The court said, "Well, let me ask you, you don't think you could be fair, is it a possibility you could be fair?" and Juror 30 answered, "I will try my best." (3-ER-523)

The government also attempted to rehabilitate Juror 30, but by that point, she was so flustered and felt "pressure[ed]," and she concluded by saying: "Well, I will try my best." (3-ER-524)

The defense moved to excuse Juror 30 for cause. (1-ER-15) The government countered that, in her questionnaire, Juror 30 said she could be fair and impartial, and the government "[thought] there were a handful of leading questions both ways and she would respond accordingly[.]" (1-ER-16) The government argued that there was no reason to believe Juror 30 "stepped off of [her] position" in the questionnaire. (1-ER-16) The court agreed with the government and denied the for-cause challenge. (1-ER-16) Juror 30 was seated on Pinedo's jury. (4-ER-635)

Following trial, the jury found Pinedo guilty. (App. 2a) The court sentenced Pinedo to ten years in prison and five years of supervised release. (App. 2a)

## II.    Direct Appeal Proceedings

On appeal, Pinedo argued, *inter alia*, that the district court abused its discretion in declining to excuse Jurors 17 and 30 for cause. (App. 2a) The majority found the district court did not abuse its discretion in empaneling either juror. (App. 4a, 7a) Regarding Juror 17, the majority noted that he "answered three times that he would be impartial"—referring to the checkmarks on the generic fairness-related questions on the questionnaire. (App. 4a) The majority mentioned just *two* of Juror 17's statements during oral voir dire and found that "I would like to think I could" and "I would do my best to *try* to be *as impartial as I can be*" "clear[ed] the threshold set by our precedent." (App. 4a) The precedent the majority cited, however, held that "I'll try," "I might," "I would want to," and "I would try to be fair," were *not* sufficient to meet the demands of the Sixth Amendment and required reversal. (App. 4a)

Regarding Juror 30, the majority acknowledged she "made equivocal statements during voir dire"—though it mentioned only a couple of statements. (App. 4a) The majority nevertheless relied on Juror 30's "three" "unequivocal commitment[s] to be impartial . . . in her juror questionnaire"—again, referring to the checkmarks. (App. 5a) The majority did not believe her expressions of bias or equivocal statements during oral voir dire wavered from those checkmarks. (App.

5a) The majority instead wrote off Juror 30's problematic statements as mere responses to "tough questions." (App. 5a)

Judge Bennett, on the other hand, believed the court made a clearly erroneous factual finding "in its statement of why it was rejecting the challenge to Juror 30." (App. 11a) In his lengthy dissent, Judge Bennett acknowledged Juror 30's questionnaire responses, as well has her multiple expressions of bias during oral voir dire. (App. 14a) Then, Judge Bennett discussed the court's failed attempt to rehabilitate Juror 30—on the one hand, recognizing she "*[did]n't think [she] could be fair*," and on the other asking if there was "*a possibility* [she] could be fair." (App. 15a) (emphasis added by Judge Bennett) "Juror 30 responded, 'I will try my best,'" which Judge Bennett determined was insufficient under this Court's precedent. (App. 15a & n.3-4) The court's finding that Juror 30 never wavered from her written responses, therefore, was a clear factual error. (App. 16a-17a) Even though Judge Bennett believed "[t]he evidence against [Pinedo] was overwhelming," he would have reversed and remanded for a new trial, because the Constitution does not tolerate even one biased juror to be empaneled, "[r]egardless of the crime charged and the evidence against him[.]" (App. 17a)

## REASONS FOR GRANTING THE PETITION

I.  **The Majority's Decision Contradicts Supreme Court and Ninth Circuit Precedent.**

The Sixth Amendment protects the defendant's right to an impartial jury. *See United States v. Kechedzian*, 902 F.3d 1023, 1027 (9th Cir. 2018). "The prime safeguard [against juror bias] is voir dire," which is designed "to elicit information from the venire that may shed light on bias, prejudice, interest in the outcome, competence, and the like[.]" *Fields v. Brown*, 503 F.3d 755, 772 (9th Cir. 2007); *see also McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554 (1984). "[J]urors are reluctant to admit actual bias, and the reality of their biased attitudes must be revealed by circumstantial evidence." *United States v. Allsup*, 566 F.2d 68, 71 (9th Cir. 1977). In fact, a juror may even be unaware of their own bias. *See Smith v. Phillips*, 455 U.S. 209, 221–22 (1982) (O'Connor, J., concurring). In reviewing claims of juror bias, courts should "[t]ak[e] account of the full record, rather than incomplete exchanges selectively culled from it[.]" *Skilling v. United States*, 561 U.S. 358, 399 (2010). And, finally, "[d]oubts regarding bias *must* be resolved *against* the juror. *See United States v. Gonzalez*, 214 F.3d 1109, 1114 (9th Cir. 2000) (quotation omitted) (emphasis added).

The majority's decision here is contrary to all of these basic principles. Rehearing is warranted to correct these errors.

**A.** **The majority's failure to consider all of Jurors 17 and 30's statements of disqualifying bias during oral voir dire contradicts Supreme Court precedent.**

First, the majority wholly ignored *all* of Juror 17's statements of disqualifying bias during oral voir dire, thereby failing to consider the full record and presenting an incomplete picture of the extent of Juror 17's actual bias. *See Skilling*, 561 U.S. at 399 (requiring review of "full record" to evaluate juror-bias claim). Reading the majority's decision, one would think the only evidence of Juror 17's actual bias was his "comment[] in the jury questionnaire that the subject matter was 'disturbing' for a 'father of two young children[.]'" (App. 4a) That is the majority's *only* reference to Juror 17's potential bias.

The following are Juror 17's statements that are missing from the majority's decision:

- He questioned "why there is a trial, honestly," and why Pinedo had not pleaded guilty since "he was caught, and busted and things[.]" (3-ER-362)

- He had a "visceral reaction" to the statement of the case and found Pinedo's anticipated defense (*i.e.*, sexual fantasy involving age play) to be "gross." (3-ER-457-58, 465-66)

- He volunteered that two of his friends had been sexually assaulted—one in a Catholic school when he was a young boy—and said he did not

know "how heavy it would weigh on [his] mind" when deciding this case. (3-ER-459-60, 462-65)

- He said he and his wife were fearful of strangers lurking on the internet because they had two young children who spent a lot of time online. (3-ER-464)

- He volunteered, without prompting, that when he was a child, his mother would "pull [him] away from the pervert in church[.]" (3-ER-464)

- He said he "[didn't] think [he] would be stoked" if he were the defendant listening to his statements during voir dire. (3-ER-465)

Clearly, the majority erred in failing to "[t]ak[e] account of the full record, rather than incomplete exchanges selectively culled from it." *Skilling*, 561 U.S. at 399.

Second, the majority similarly omitted many of Juror 30's statements of disqualifying bias. (*See* App. 4a–6a) Again, reading the majority's decision, one would think Juror 30 only said that "'[i]t would be' difficult to look at charges involving minors without being biased and that she '[p]robably . . . wouldn't be a good juror.'" (App. 4a) Fortunately, Judge Bennett provided a more thorough review of Juror 30's disqualifying statements in his dissent, (App. 9a-11a) including:

- Juror 30 said she had "strong feelings" about the case and believed adults should not fantasize about "innocent kids". (3-ER-521)

- She "[did]n't know" whether those feelings would make it difficult for her to be a juror in this case. (3-ER-521)

- She did not want adults to see her "two teenagers" and "nieces and nephews" and fantasize about them. (3-ER-521)

- She said, "Honestly, I think [the subject matter is] too strong for me to" "put aside [my] feelings." (3-ER-522)

- When asked if she could put aside her feelings toward the charges, she said, "I will try to, but I don't know." (3-ER-522)

- She *confirmed* that "it would be" "difficult for [her] to look at charges like that without being biased." (3-ER-522)

The majority likewise erred in failing to consider the record as a whole, as opposed to just two statements that appeared to support its decision. *See Skilling*, 561 U.S. at 399.

Importantly, Juror 17 and 30's statements are far more egregious than the disqualifying bias this Court has previously found worthy of reversal. For instance, in *Gonzalez*, a cocaine distribution and money laundering case, one prospective juror's ex-husband had dealt illegal drugs, which was the cause of their divorce. 214 F.3d at 1110–11. The juror's mere prior experience with the subject matter of the case was enough to cast doubt on her ability to be fair. Similarly, in *Kechedzian*, an identity theft case, it was a prospective juror's prior experience

having her social security number stolen that constituted potentially disqualifying bias. 902 F.3d at 1026, 1029-31. And, in both those cases, this Court reversed and remanded for a new trial because the jurors did not make an unequivocal commitment to set aside those feelings and be impartial.

### B. The majority's decision that Jurors 17's equivocal statements met this Court's threshold is contrary to the very precedent it cites.

The majority also erred in finding that Juror 17's equivocal statements during voir dire "clear[ed] the threshold set by our precedent." (App. 4a) The majority again omits many of Juror 17's equivocal statements, relying on just two—presumably the strongest two that support the majority's decision: "'I *would like to think I could*' put personal feelings aside and that 'I would let him know that as a citizen of this country, I would *do my best* to *try* to be *as impartial as I can be*.'" (App. 4a) (emphasis added) These statements apparently "clear[] the threshold" of *Gonzalez*, 214 F.3d at 1111 (reversing for "I'll try"), and *Kechedzian*, 902 F.3d at 1029 (reversing for "I might be able to put that aside," "I would want to put my personal stuff aside, but I honestly don't know if I could," and "I would try to be fair"). (App. 4a)

But, a review of Juror 17's statements compared to the legally insufficient statements in *Gonzalez* and *Kechedzian* reveals there is no meaningful difference.

14

| Juror 17's Statements | Precedent Requiring Reversal |
|---|---|
| "I would like to think I could" | "I would want to . . . " |
| "I would do my best to *try* to be *as impartial as I can be*" | "I'll try"; "I would try to be fair" |

The majority's conclusory decision, without explanation, loses even more of its footing when one considers *the rest* of Juror 17's statements that the majority ignored. The majority, thus, erred in its legal conclusion.

### C.    The majority's reliance on the written questionnaires is misplaced.

Underlying the majority's finding of no error here is its belief that the jurors' responses on the written questionnaire constituted unequivocal commitments to be impartial and were sufficient to carry the day. (App. 4a-5a) To be clear, these were simply *checkmarks* next to generic fairness-related questions at the end of the a 69-question form. (*See* App. 3a; SER-13-14, 29-30) They were "privately filled out" before either the court or the parties had an opportunity to speak to the prospective jurors. (App. 3a) Although the jurors signed them "under penalty of perjury," they "declare[d] that all their answers were true and correct *to the best of their knowledge*," (App. 3a) (emphasis added). And, the questionnaires were meant to serve as an initial-stage review to weed out prospective jurors and provide a base from which to conduct oral voir dire. (App. 3a)

With that in mind, the dispositive weight the majority assigned these checkmarks is misguided and is contrary to judicially-recognized principles of jury selection. The jurors answered these questions before they may have been aware of their biases, which caselaw recognizes are revealed primarily through voir dire. *See Fields*, 503 F.3d at 772; *see also Greenwood*, 464 U.S. at 554 (1984); *Allsup*, 566 F.2d at 71; *Smith*, 455 U.S. at 221–22 (1982) (O'Connor, J., concurring).

The majority's reliance on the written questionnaires—to the exclusion of the jurors' statements during oral voir dire—is also contrary to the principle that a juror who expresses bias must be rehabilitated, by the court or counsel eliciting a *subsequent* unequivocal commitment to be impartial. *See, e.g.*, *Hughes v. United States*, 258 F.3d 453, 460 (6th Cir. 2001) (finding juror should have been disqualified as biased, where juror made "express admission of bias, with no subsequent assurance of impartiality and no rehabilitation by counsel or the court"). By relying on the pre-bias checkmarks on the questionnaire, the majority eschews this need for rehabilitation *after* the jurors' express admissions of bias.

**D. The majority's affirmance regarding Juror 30 is contrary to precedent requiring doubts to be resolved against the juror.**

As a threshold matter, the majority explicitly stated: "To be sure, Juror 30 *made equivocal statements during voir dire*." (App. 4a) (emphasis added) Then, after omitting most of Juror 30's more problematic statements, the majority again acknowledged Juror 30's "relative equivocation," but sought to dismiss it by

blaming "[t]he intensity of her questioning[.]" (App. 5a) But, as the record shows, counsel remained polite and respectful throughout questioning; it was Juror 30 who felt flustered and uncomfortable with the process. In any event, Juror 30 made those statements, and they must be considered. Moreover, the mere fact that Judge Bennett concluded Juror 30 should not have been empaneled confirms that there were doubts regarding her bias and ability to be impartial. Against this backdrop, the majority erred in failing to resolve those acknowledged doubts against Juror 30. *See Gonzalez*, 214 F.3d at 1114.

## II.     This Case Involves an Exceedingly Important Question Regarding Biased Juror Claims That Must Be Resolved to Avoid Eroding the Sixth Amendment's Right to an Impartial Jury.

Although this decision is unpublished, the majority has set a very dangerous example that the government and courts are free to follow and can eviscerate the right to an impartial jury. According to the majority, as long as a prospective juror checks "yes" next to a generic fairness-related question on a written questionnaire, subsequent expressions of bias do not matter. The court can rely on those pre-bias checkmarks—signed under the ominous "penalty of perjury," though qualified as being "to the best of their knowledge"—to reject claims of juror bias. Although the majority believed the use of written questionnaires here was "different[] than usual," (App. 3a), there is nothing preventing this procedure from becoming more commonplace.

17

To cut off the dangerous path the majority has laid out in its decision, this Court should decide that, where a prospective juror expresses bias, they must give a *subsequent* unequivocal commitment to remain impartial despite that bias. *See, e.g.*, *Hughes*, 258 F.3d at 460. Without such a requirement, there can be no assurance that the high demands of the Sixth Amendment are met. Otherwise, we would allow jurors to be empaneled based on their noble aspirations to be fair and impartial, before they may even be aware of the feelings, beliefs, or experiences that could affect their ability to be impartial. That is no way to protect one of the most fundamental rights of the American criminal justice system.

Moreover, a rule requiring a subsequent unequivocal commitment to impartiality would set clear expectations for district courts, parties, and prospective jurors about what is required under the Sixth Amendment. But, even if this Court does not establish that particular rule, it nonetheless must address the exceedingly important questions that affect jury selection in this circuit. The Sixth Amendment right to an impartial jury warrants this Court's attention and protection.

## CONCLUSION

For the foregoing reasons, the petition for panel rehearing and rehearing en banc should be granted.

Dated: July 6, 2024

Respectfully submitted,

CUAUHTEMOC ORTEGA
FEDERAL PUBLIC DEFENDER

By: /s/ *Michael Gomez*
    Michael Gomez
    Deputy Federal Public Defender

    *Counsel for Defendant-Appellant*
    *Albert Pinedo*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form11instructions.pdf*

**9th Cir. Case Number(s)** | 21-50242

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 35-4 or 40-1, the attached petition for

panel rehearing/petition for rehearing en banc/response to petition is (*select one*):

⦿ Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words**: 4,198 .

*(Petitions and responses must not exceed 4,200 words)*

**OR**

◯ In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** | s/ Michael Gomez          **Date** | Jul 6, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 11** *Rev. 12/01/2021*

# APPENDIX

MEMORANDUM DISPOSITION

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

MAY 7 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | No.    21-50242 |
| Plaintiff–Appellee, | D.C. No. 2:20-cr-00148-GW-1 |
| v. | |
| ALBERT PINEDO, | MEMORANDUM* |
| Defendant–Appellant. | |

Appeal from the United States District Court
for the Central District of California
George H. Wu, District Judge, Presiding

Argued and Submitted January 10, 2024
Pasadena, California

Before:  CALLAHAN and BENNETT, Circuit Judges, and KATZMANN,** Judge.
Dissent by Judge BENNETT.

Defendant–Appellant Albert Pinedo appeals the district court's judgment of

conviction for one count of attempted enticement of a minor in violation of 18

U.S.C. § 2422(b).  We have jurisdiction under 28 U.S.C. § 1291.  We affirm.

---

\*        This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

\*\*       The Honorable Gary S. Katzmann, Judge for the United States Court
of International Trade, sitting by designation.

In February 2020, Pinedo published a post on Craigslist looking for a sexual encounter. Special Agent Paul Radlinski responded to his post as a fictitious 14-year-old named "Robby." The two soon made plans to meet and arranged for Pinedo to bring a sex toy and bottle of lubricant to the scene. Upon his arrival, law enforcement arrested Pinedo. They also photographed and collected the sexual accoutrements. In March 2020, Pinedo was indicted of one count of attempted enticement of a minor to engage in oral copulation and lewd and lascivious acts with a child, as prohibited under California Penal Code sections 287(b)(2) and 288(c)(1), under 18 U.S.C. § 2422(b).

The defense's theory of the case was that Pinedo was engaged in a consensual fantasy with another adult roleplaying as a minor named "Robby." Following trial, the jury convicted Pinedo. He was sentenced to ten years followed by five years of supervised release. Pinedo timely appealed.

1. Pinedo first appeals the district court's denials of his for-cause challenges to two jurors. Pinedo argues that Jurors 17 and 30 repeatedly expressed actual biases against the subject matter of the case, including Pinedo's anticipated defense of adult roleplay involving minors in fantasy, and that they never unequivocally stated they could be fair and impartial as required by the Sixth Amendment of the U.S. Constitution. We review rulings on actual bias for "manifest error or abuse of discretion." *United States v. Gonzalez*, 214 F.3d 1109,

Appendix 2a

1112 (9th Cir. 2000). When reviewing claims of actual bias, "the deference due to district courts is at its pinnacle." *Skilling v. United States*, 561 U.S. 358, 396 (2010).

Pinedo's trial in July 2021 was among the first in the Central District of California since the suspension of trials in March 2020 due to the Covid-19 pandemic. *See* C.D. Cal. General Order 21-08 (June 11, 2021). Jury selection proceeded differently than usual. Prospective jurors first reviewed a statement of the case and each privately filled out a 69-question form, which was formulated by the parties and included questions specific to the case. The questionnaires included four questions addressing the prospective juror's commitment to impartiality. Each prospective juror was required to sign under penalty of perjury and declare that all their answers were true and correct to the best of their knowledge.

Several prospective jurors were dismissed for cause based solely on the questionnaire responses. The remaining prospective jurors were then called into the courtroom one by one and stood at the lectern. The district court was on the bench, and counsel for Pinedo and the Government sat at counsel table. They each took turns asking prospective jurors about their written answers, as if being cross-examined. Both Jurors 17 and 30, and at least one other prospective juror, exhibited nervousness when answering questions.

21-50242

Appendix 3a

The district court did not abuse its discretion in empaneling Juror 17. After commenting in the jury questionnaire that the subject matter was "disturbing" for a "father of two young children," he nonetheless answered three times that he would be impartial. "Jurors are human, so we do not demand that they pledge impartiality with complete certainty." *United States v. Kechedzian*, 902 F.3d 1023, 1030 n.2 (9th Cir. 2018). Juror 17 later stated during voir dire that "I would like to think I could" put personal feelings aside and that "I would let him know that as a citizen of this country, I would do my best to try to be as impartial as I can be." Those statements clear the threshold set by our precedent. *See Gonzalez*, 214 F.3d at 1111 (reversing for "I'll try"); *Kechedzian*, 902 F.3d at 1029 (reversing for "I might be able to put that aside," "I would want to put my personal stuff aside, but I honestly don't know if I could," and "I would try to be fair").

Nor was the decision to empanel Juror 30 an abuse of discretion. To be sure, Juror 30 made equivocal statements during voir dire. She said that "[i]t would be" difficult to look at charges involving minors without being biased and that she "[p]robably . . . wouldn't be a good juror." And she repeatedly answered that she would "try [her] best" to be impartial. Equivocal statements, by themselves, do not satisfy the Sixth Amendment. *See Kechedzian*, 902 F.3d at 1029 (reasoning that the juror "never affirmatively stated that she could be impartial"); *Gonzalez*, 214 F.3d at 1111 (explaining that the juror "never stated affirmatively that she could

put aside her personal experiences, nor did she ever state that she could be fair or impartial").

But Juror 30 did make an unequivocal commitment to be impartial—three times, like Juror 17—in her juror questionnaire. The district court "agree[d]" with the prosecutor that during voir dire "there were a handful of leading questions both ways and [Juror 30] would respond accordingly, but . . . ultimately there is no reason to think her written questionnaire [sic] she stepped off of that position in any meaningful way." The record supports that conclusion. Juror 30 on voir dire faced tough questions from the prosecution, defense, and district court, as if being cross-examined. Among her answers were "I don't know what to say," and "Why are you guys pressuring me[,] I don't know what to say." The intensity of her questioning provides context for her relative equivocation during voir dire, like the statement that she "[p]robably . . . wouldn't be a good juror."

The Sixth Amendment right to an impartial jury is inviolable. The presence of even one biased juror cannot be harmless. *See Gonzalez*, 214 F.3d at 1111. While our review of claims of juror bias must be careful, we are also mindful of the "repeatedly emphasized" principle that jury selection "is particularly within the province of the trial judge." *Skilling*, 561 U.S. at 386 (internal quotation marks and citations omitted). In this case, the district court was best situated to assess the totality of Juror 30's questionnaire responses and voir dire statements, having

observed her tone, body language, and demeanor in the courtroom. *See*

*Kechedzian*, 902 F.3d at 1027. It was not "manifest error" for the district court to

determine that her statements during voir dire were the result of intense

questioning rather than a genuine departure from impartiality.[1] *Gonzalez*, 214 F.3d

---

[1] The dissent states that the district court's conclusion, agreeing with the prosecution, "that Juror 30's voir dire responses were no different 'in any meaningful way' from her questionnaire answer that she could be fair and impartial is clearly factually erroneous." Dissent at 6–7. We are not so persuaded of that singular reading. The district court's reference to "any meaningful way" still coheres with the conclusion that some of Juror 30's answers were better understood as responses to leading questions from counsel, rather than as genuine departures from impartiality.

The dissent also states that portions of Juror 30's voir dire were contradictory and that the district court acknowledged those contradictions by saying to Juror 30, "you don't think you could be fair." *See id.* But jurors "cannot be expected invariably to express themselves carefully or even consistently." *Skilling*, 561 U.S. at 397 (quoting *Patton v. Yount*, 467 U.S. 1025, 1040 (1984)). Moreover, the district court's quoted statement is better read as an attempt to understand Juror 30's commitment to impartiality, rather than an acknowledgement of her bias. The exchange reads:

> THE COURT: Well, let me ask you, you don't think you could be fair, is it a possibility you could be fair?
>
> PROSPECTIVE JUROR: I will try my best.
>
> THE COURT: Okay. And you will try to follow the Court's instructions on the law; is that correct?
>
> PROSPECTIVE JUROR: Yes.

That exchange on the cold record illustrates the broader point. The prosecution, defense counsel, and the district court all acknowledged that Juror 30 was under pressure. But from where we sit now, we have only the cold record. "It is here

Appendix 6a

at 1112. Where, as here, our deference to that determination is at its "pinnacle," *Skilling*, 561 U.S. at 396, we conclude that the decision to empanel Juror 30 was not an abuse of discretion.

2.     Pinedo next appeals the district court's denial of his motion in limine to exclude the testimony of Detective Wayne Nichols, the Government's expert witness on internet crimes against children and related investigations. Pinedo argues that the Nichols's expert testimony was erroneously admitted because it (1) addressed matters the average juror could have understood and (2) improperly bolstered the credibility of Agent Radlinski's testimony. "We review a district court's admission of expert testimony or lay opinion testimony for abuse of discretion." *United States v. Rodriguez*, 971 F.3d 1005, 1017 (9th Cir. 2020).

Admitting the testimony was not an abuse of discretion. Nichols offered specialized knowledge on the modus operandi of online pedophiles and on the law enforcement investigations of internet crimes against children, and it was reasonable to determine that his knowledge was outside the jury's common knowledge. *See United States v. Valencia-Lopez*, 971 F.3d 891, 901 (9th Cir. 2020); *United States v. Brooks*, 610 F.3d 1186, 1196 (9th Cir. 2010). Nor did

---

that the federal appellate court's deference must operate, for while the cold record arouses some concern, only the trial judge could tell which of these answers was said with the greatest comprehension and certainty." *Skilling*, 561 U.S. at 398 (quoting *Yount*, 467 U.S. at 1040).

21-50242

Appendix 7a

Nichols's testimony unlawfully bolster Radlinski's testimony. It was Pinedo who questioned the investigation's adequacy in an attempt to show that he lacked criminal intent of meeting an actual minor rather than a roleplaying adult. Nichols offered expert testimony to rebut Pinedo's assertion of an inadequate investigation, *cf. United States v. Rivera*, 43 F.3d 1291, 1295 (9th Cir. 1995), and did not improperly comment on the specific facts of this case or on Radlinski's performance as an investigator. *See Tekoh v. County of Los Angeles*, 75 F.4th 1264, 1266 (9th Cir. 2023). Finally, any error would have been harmless. A wealth of other email and circumstantial evidence supported Pinedo's criminal intent.

3.     Pinedo next challenges the district court's denial of his motion to exclude physical exhibits of the sex toy and bottle of lubricant, which he argues are unduly prejudicial and needlessly cumulative under Federal Rule of Evidence 403. We review evidentiary rulings for abuse of discretion, *see United States v. Martin*, 796 F.3d 1101, 1105 (9th Cir. 2015), and Rule 403 rulings in particular are subject to "great deference" to the district court. *United States v. Hinkson*, 585 F.3d 1247, 1267 (9th Cir. 2009) (en banc).

Admitting the physical evidence was not an abuse of discretion. The photographs of the sex toy and bottle of lubricant were admitted into evidence without challenge on appeal. Because the difference in probative value and in

Appendix 8a

undue prejudice between the photographic and physical evidence is minimal, the district court's decision was not "beyond the pale of reasonable justification under the circumstances." *United States v. Espinoza-Baza*, 647 F.3d 1182, 1189 (9th Cir. 2011). Moreover, any error would have been harmless. The district court limited the Government to a "mere showing of the items" and warned against any "untoward comment," and the Government did not emphasize the physical exhibits in a way that would have enflamed the jury any more than the photographs would have.

4. Finally, Pinedo argues that the district court erred in giving the wet-sidewalk example of circumstantial evidence in Ninth Circuit Model Criminal Jury Instruction 1.5 because that instruction improperly shifts the burden of proof in criminal cases to the defendant. The district court issued the following instruction before the parties gave their opening statements at trial:

> By way of example, if you wake up in the morning and see that the sidewalk is wet, you may find from that fact that it rained during the night. However, other evidence, such as a turned-on garden hose, may provide an explanation for the water on the sidewalk. Therefore, before you decide that a fact has been proven by circumstantial evidence, you must consider all the evidence in the light of reason, experience, and common sense.

We review jury instructions that are challenged as "incorrect statement of law" de novo. *United States v. Redlightning*, 624 F.3d 1090, 1122 (9th Cir. 2010).

9                                    21-50242

Appendix 9a

The jury instruction accurately states the law and is not otherwise misleading.  The instruction does not incorrectly suggest that only one inference may be derived from the fact of a wet sidewalk.  The first sentence states that the juror "*may* find from that fact that it rained during the night."  The second sentence then makes clear that competing inferences may be drawn from the fact of a wet sidewalk in light of other facts, "such as a turned-on garden hose."  Nor could a juror reasonably have understood the instruction to shift the burden of proof to the defendant, *see Sandstrom v. Montana*, 442 U.S. 510, 523–24 (1979), because the instruction makes no mention of burdens of proof or default conclusions.  Finally, any potential ambiguity in the instruction would have been harmless; the district court and all parties explained to the jury, at least six times, that the Government bears the burden of proof.

**AFFIRMED.**

Appendix 10a

FILED

*United States v. Albert Pinedo*, No. 21-50242

MAY 7 2024

BENNETT, Circuit Judge, dissenting:

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

I would reverse and remand for a new trial, as I believe the district court erred in rejecting Pinedo's for-cause challenges to Juror 30.[1]  The Sixth Amendment guarantees "trial, by an impartial jury" because "trial by jury in criminal cases is fundamental to the American scheme of justice."  *Duncan v. Louisiana*, 391 U.S. 145, 149, 153 (1968).  The presence of "[i]mproper influence or bias of a single juror" impermissibly affects a criminal defendant's right to a trial by impartial jurors. *United States v. Simtob*, 485 F.3d 1058, 1064 (9th Cir. 2007).  Pinedo alleges Juror 30 expressed significant disqualifying bias against him during jury selection.  The district court found no disqualifying bias, and the majority agrees.  But the district court abused its discretion when it made a clear material factual error in its statement of why it was rejecting the challenge to Juror 30.  This error so infected the court's "no disqualifying bias" determination that we cannot affirm that determination.  The inclusion of Juror 30 as a member of the jury panel despite her unambiguous bias resulted in a clear violation of Pinedo's Sixth Amendment rights.  Because of that, Pinedo is entitled to a new trial.  Thus, I respectfully dissent.

"[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."  *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).

---

[1] I agree with the remainder of the majority's disposition.

1

Appendix 11a

"The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Id.* (citing *In re Oliver*, 333 U.S. 257 (1948); *Tumey v. Ohio*, 273 U.S. 510 (1927)). A foundational principle "of the law is that a juror who has formed an opinion cannot be impartial." *Reynolds v. United States*, 98 U.S. 145, 155 (1878). It is true that "[b]ecause determinations of impartiality may be based in large part upon demeanor, this court typically accords deference to the district court's determinations." *United States v. Gonzalez*, 214 F.3d 1109, 1112 (9th Cir. 2000). However, "[r]ulings on actual bias are reviewed for manifest error or abuse of discretion," and "[a] district court abuses its discretion when it[] bases a decision 'on an erroneous legal standard or a clearly erroneous finding of fact.'" *United States v. Kechedzian*, 902 F.3d 1023, 1027 (9th Cir. 2018) (quoting *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012)).

On her juror questionnaire, Juror 30 answered "no" to the following question:

Given the nature of the charge against the defendant, do you hold any strong opinions or convictions that you believe would prevent you from being a fair juror and/or following the instructions as the Court gives them in this case?

The Juror answered "yes" to the following question:

The jurors who hear this case will be instructed that they must base their verdict solely on the evidence presented in court, and not on sympathy, passion or prejudice. Will you be able to follow this instruction?

The Juror also answered "yes" to this question:

2

Appendix 12a

> Do you feel that you could be a completely fair and impartial juror to both the Defendant and the Government in this case?

One answer, however, raised concerns in the mind of the district court and defense counsel:

> [Question:] You may hear evidence about how individuals with a sexual interest in minors engage in coping strategies (including engaging in role-playing) in order to avoid illicit sexual activity. Do you have any strong beliefs or convictions about whether it is appropriate for individuals with a sexual interest in minors to engage in coping strategies such as fantasy?
>
> [Answer:] Yes. Adult should <u>not</u> be engage[d] in coping strategies such as fantasy with minors. (emphasis in original).[2]

The district court understandably asked Juror 30 about her answer:

> There is an important distinction between fantasies with minors; in other words, fantasies involving minors and fantasies about minors. In other words, if somebody has a fantasy and doesn't do any physical actions or take any steps to do anything about it, but just has fantasies, that might very well be distasteful but that may not be a violation of the law. Do you understand that?

Juror 30 responded that she now understood the distinction. She then stated that she didn't think there was anything that would prevent her from being completely fair and impartial to both sides. If this were the end of the Juror 30 voir dire, then I would agree with the majority. But this was not the end.

---

[2] The juror also answered "Yes," to this question: "Is there anything that you would like to bring to the Court's attention that might, in any way, affect your ability to be a fair and impartial juror in this case or otherwise to serve as a juror?"

Appendix 13a

Defense counsel asked Juror 30 if she had "strong feelings" about "[o]ne of the adults [in this case] pretending to be a child." Echoing her questionnaire answer, Juror 30 stated: "I don't think adults should be . . . [w]ell, a child is so innocent, why would you want to think about kids – innocent kids like that?" She stated that she has "two teenagers" and "nieces and nephews" and she "d[id] not want people to see them and fantasize about that." Then, when asked whether, given those feelings, if she thought it would be difficult for her to be fair, Juror 30 responded, "I don't know."

When asked if she thought she would be able to have an open mind or if the case subject was "just too strong for [her] to . . . put aside [her] feelings," Juror 30 responded, "Honestly, I think it's too strong for me to." Defense counsel then asked whether just based on the charge itself, would Juror 30 be able to put those feelings aside, and Juror 30 said, "I will try to, but I don't know." After previewing the evidence to be introduced at trial, defense counsel *again* asked Juror 30 to confirm that "it would be difficult for [her] to look at charges like that without being biased; is that right?" Juror 30 stated: "*It would be yes. I would think so.*" (emphasis added). Juror 30 also said, "Probably I wouldn't be a good juror."

Appendix 14a

The district court then tried to rehabilitate Juror 30. The court stated, "*[Y]ou don't think you could be fair*, is it a *possibility* you could be fair?"[3] (emphasis added). Juror 30 responded, "I will try my best."[4] The government also tried to rehabilitate Juror 30, referring to her written questionnaire and asking Juror 30 if she still felt she could reach a verdict based on the evidence. Juror 30 replied, "Why are you guys pressuring me. I don't know what to say." Juror 30 concluded with the equivocal statement that she would "try [her] best."

The court then heard for-cause challenges to the prospective jurors. Defense counsel moved to exclude Juror 30 for cause, because "she said her initial response was she didn't think she could be fair. And then in response to further questioning, she said . . . I feel like you guys are pressuring me, I will try my best." Defense counsel then noted that Juror 30's initial voir dire responses were that "she doesn't"

---

[3] Of course, it does not matter whether there is a "possibility" a juror could be fair. No case holds that the *possibility* a juror could be fair satisfies the Sixth Amendment. *See Kechedzian*, 902 F.3d at 1029, 1031 (reversing and remanding for a new trial where a juror stated that she "might be able to" put aside her feelings, she would "want to put [her] personal stuff aside, but [she] honestly [didn't] know if [she] could," and she "would try to be fair," because those statements were equivocal).

[4] We have repeatedly rejected similar answers after concluding they were equivocal. *See Kechedzian*, 902 F.3d at 1029 ("[A] response of 'I'll try' is not an unequivocal statement"); *Gonzalez*, 214 F.3d at 1113 n.5 ("Despite the government's best efforts to characterize the response 'I'll try' as unequivocal, we cannot agree . . . . If a parent asks a teenager whether he will be back before curfew, that parent is highly unlikely to find 'I'll try' an adequate, satisfactory, or unequivocal response.").

5

Appendix 15a

think that she could be fair because of the nature of the evidence, because of her young children, and her young nieces and nephews." The prosecutor responded:

> For this juror it's important the questionnaire asked her, after giving her the nature of the case and so forth, ultimately the key questions which are 66, 67, and 68, she said she could be fair and impartial. I don't think the questioning in the jury – the time she was in here moved her from that position. I think there were a handful of leading questions both ways and she would respond accordingly, but I think that ultimately there is no reason to think her written questionnaire she stepped off of that position in any meaningful way.

With no further explanation, the district court stated, in response to the prosecutor's statement: "I agree. I will deny the for cause challenge." To be clear, the prosecutor stated that Juror 30 never moved from her position expressed in the written questionnaire that she could be fair and impartial; never stepped off that position in "any meaningful way," and the district court then explicitly agreed with that statement and denied the challenge for that reason. But the record makes clear the prosecutor's statement is simply wrong. The district court itself said to Juror 30 that "you don't think you could be fair" because of Juror 30's direct statement that the nature of the case was "just too strong for [her] to . . . put aside [her] feelings." When asked if it would be difficult for her "to look at charges like that without being biased," she replied: "It would be yes. I would think so . . . . Probably I wouldn't be a good juror." The district court's conclusion (agreeing with the prosecutor) that Juror 30's voir dire responses were no different "in any meaningful way" from her questionnaire answer that she could be fair and impartial is clearly factually

6

erroneous. The majority seems to recognize that when writing that "[t]o be sure, Juror 30 made equivocal statements during voir dire." Maj. at 4. And it is true that at the *beginning* of her questioning, Juror 30 said she didn't think there was anything that would prevent her from being fair and impartial. But after that, and several times, Juror 30 clearly contradicted that original statement, which even the district court explicitly recognized when it stated, "you don't think you could be fair." And again, the district court based its ruling rejecting the for-cause challenge on its agreement with the prosecutor's clearly incorrect factual statement. While the district court's decision is entitled to deference, that deference does not extend to the district court basing its decision on clearly erroneous facts.

The evidence against the defendant was overwhelming. But the "most priceless" safeguard for the preservation of "of individual liberty and of the dignity and worth of every man . . . is that of trial by jury." *Irvin*, 366 U.S. at 721. "This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies." *Id.* at 722. Regardless of the crime charged and the evidence against him, a defendant is entitled to a fair trial by an impartial jury. Because the district court empaneled a jury containing a biased juror it should have excused for cause, the defendant was denied his "most priceless" safeguard.

Thus, I respectfully dissent.

7

Appendix 17a